**INTERNATIONAL LONGSHOREMEN'S & WAREHOUSEMEN'S UNION et al. v. JUNEAU SPRUCE CORPORATION.**

No. 12527.

United States Court of Appeals
Ninth Circuit.

May 5, 1951.

Rehearing Denied June 8, 1951.

See also, D.C., 83 F.Supp. 224.

Gladstein, Andersen & Leonard, George R. Andersen, Norman Leonard and Allan Brotsky, all of San Francisco, Cal., William L. Paul, Jr., Juneau, Alaska, for appellants.

Hart, Spencer, McCulloch, Rockwood & Davies, Manley B. Strayer and James P. Rogers, all of Portland, Or., Faulkner, Banfield & Boochever, Juneau, Alaska, for appellee.

Before STEPHENS, BONE and POPE, Circuit Judges.

BONE, Circuit Judge.

Appellee and plaintiff below, Juneau Spruce Corporation, hereafter sometimes referred to as "Juneau" is a corporation organized under the laws of the Territory of Alaska having its principal place of business at Juneau, Alaska. Appellant, International Longshoremen's and Warehousemen's Union (hereafter sometimes referred to as "International") and appellant, International Longshoremen's and Warehousemen's Union, Local 16 (hereafter sometimes referred to as "Local 16") are labor organizations claimed by appellee to be within and subject to the provisions of the so-called Taft-Hartley Act. 29 U.S.C.A. § 141 et seq. Local 16 is chartered by and affiliated with "International."

Appellee's complaint generally alleged and charged that the instant cause of action arose under the laws of the United States regulating commerce, more particularly under Section 303 of the Labor-Management Relations Act, 1947, commonly referred to as the Taft-Hartley Act.[1] It averred that appellee is an Alaska corporation in good standing; that International was a labor organization engaged in directing, representing, and acting for its members and local unions in the Territory of Alaska, in the Province of British Columbia, Dominion of Canada and in various ports of the West Coast of the United States, that is in ports in the States of Washington, Oregon and California; that Local 16 was at all times material to the action a labor organization chartered by and affiliated with International with its headquarters in the city of Juneau, Alaska and engaged in representing its members in and about that city; that at all times material to the action appellee conducted lumber manufacturing operations in places in Alaska; that logs owned and controlled by the company are manufactured into lumber products at appellee's mill in Juneau; that appellee maintains retail lumber yards in Juneau and Fairbanks in the Territory of Alaska at which yards it sells a portion of the lumber manufactured at its Juneau mill as well as other materials in commerce commonly sold in retail lumber yards, all of said other articles being purchased in the United States and transported to said lumber yards; that appellee sells the majority of the lumber and lumber products produced at its Juneau mill to customers in many states of the United States, shipping said lumber and lumber products so sold to said customers by water to West Coast ports in the United States and Canada and from said ports by railroad to its customers located as aforesaid; that appellee is unable to receive or ship products in the operation of its business except by water, in whole or in part; that the loading and unloading of appellee's barges at its mill in Juneau is an essential part of the manufacture and sale of appellee's lumber and lumber products.

Appellee's complaint further averred that at all times material to the action a labor organization, to wit, International Woodworkers of America, Local M–271 has at all times mentioned in the complaint represented and now represents all of appellee's employees at its mill and retail yard in Juneau except appellee's clerical and supervisory employees and that appellee has at all times mentioned in the complaint recognized and bargained with said Local M–271 as such representative; that at all times mentioned in the complaint there has been and now is in effect a collective bargaining agreement between appellee and Local M–271 wherein appellee recognized the right of Local M–271 to bargain for appellee's employees at its Juneau operations; that on or about April 10, 1948 and until the time of filing the complaint defendant-appellants have unlawfully engaged in and induced and encouraged appellee's employees at Juneau, Alaska and employees of other employers, to engage in a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities of appellee, or to perform any services for appellee.

Appellee's complaint further averred generally that an object of appellants in their activities above noted has been, and is, to force and require appellee to assign the work of loading its barges with its lumber to members of Local 16 rather than to other persons including members of Local M–271 to whom said work had theretofore been assigned; that neither of appellants herein has been certified by the National Labor Relations Board as the bargaining representative for employees performing such work.

Appellee's complaint further averred that as a direct and proximate result of the picketing and coercive statements of appellants and of the communication of the fact of said picketing to other labor organizations in ports of the United States and Canada, and elsewhere, all of which activities have been carried on since April 10,

1. Referred to in this opinion as "the Act."

1948 and are now continuously carried on, appellee's employees at its Juneau mill refused to work for a long period of time and appellee was forced to close said mill as a result thereof; that sufficient employees returned to work on or about July 18, 1948 to enable appellee to operate said mill until October 11, 1948, but at greatly increased cost to appellee; that because of the activities of appellants aforesaid, appellee has been unable to ship its lumber from its mill to customers as a result of which appellee was again forced to close its mill on October 11, 1948; and that because of the said activities of appellants, appellee has been and is unable to transport materials to its retail yards in Alaska.

The foregoing charges are followed by an allegation that appellee was damaged by appellants' said activities in the sum of $1,025,000 and appellee has been forced to employ attorneys for the maintenance and prosecution of this action and will incur fees for such services in a minimum reasonable amount of $10,000. The prayer of the complaint is for recovery of these sums and for appellee's costs and disbursements in the action.

Appellants entered general denials of the material averments of appellee's complaint and set up certain affirmative defenses. Local 16 admitted that appellee is engaged in commerce within the meaning of Section 2, subsections 6 and 7 of the Act and that Local 16 is a labor organization within the meaning of Section 2, subsection 5 of the Act.

As an affirmative defense Local 16 alleged that ever since appellee commenced its operations, it has been and now is a party to a collective bargaining agreement which Local 16 had with all employers engaged in business along the waterfront in Juneau, Alaska, such employers being commonly known as "The Waterfront Employers' Association of Juneau, Alaska"; that said collective bargaining agreement provided that said waterfront employers agreed to hire for longshore work members of Local 16, and that under and by virtue of said agreement members of Local 16 have been "employees" of appellee since appellee commenced business operations;

that on or about October 23, 1947, with the full knowledge and acquiescence and consent of Local M-271, appellant, Local 16 then and subsequently asserted to appellee that it would picket the operations of appellee at its Juneau mill because appellee was violating the contract Local 16 had with the said Waterfront Employers' Association of Juneau, Alaska unless appellee agreed to abide by said contract and reduce the terms thereof to writing; that on April 10, 1948 Local 16 engaged and continued in peacefully picketing the operations of appellee at its mill in Juneau, Alaska through 1948 to induce appellee to comply with the contract between Local 16 and the said Waterfront Employers' Association of Juneau.

By way of reply to the affirmative defense above referred to appellee specifically denied that Local 16 had been or was a party to the collective bargaining agreement with all employers engaged in business along the waterfront in Juneau and further denied that members of Local 16 have been employees of appellee by virtue of said agreement. Appellee further denied that it was or had been a party to the collective bargaining agreement asserted by Local 16 to exist between Local 16 and the said Waterfront Employers' Association of Juneau, Alaska. Other denials by appellee put in issue all of the material allegations set forth in the affirmative defense of Local 16.

Evidence (partly undisputed) was presented to the jury from which it could properly infer and conclude that the following facts relating to the dispute between the parties had been established as true. Early in 1947 appellee purchased from Juneau Lumber Mills, Inc. certain of the physical assets belonging to the latter company, including a sawmill at Juneau, Alaska. Appellee commenced operations at the purchased sawmill property in May of that year. Appellee's principal sale of lumber was to the Army Engineers who took delivery of the lumber at appellee's dock. In September, 1947 the Army Engineers cancelled their purchase contract. Appellee sought a new outlet for its products and acquired certain barges (the

loading work of which is here in dispute) for use in shipping lumber to ports in the United States and Canada. The barges were also to serve as an auxiliary "storage space" for lumber. When it purchased the aforesaid mill assets the appellee provided and prescribed in the purchase agreement that it did not assume any labor agreements made by the selling company.

Shortly after it commenced operations on the acquired property appellee negotiated with representatives of I.W.A. Local M–271 (a sawmill workers local union which was affiliated with its own international organization) and these negotiations culminated in a collective bargaining agreement with the said sawmill workers union which agreement constituted the said millworkers union as the exclusive bargaining agent for all of appellee's mill employees except clerical and supervisory employees. The contract *included* the disputed work of loading the barges.

At or about the time the aforesaid negotiations with Local M–271 were under way Local 16 requested appellee to negotiate with it in respect to certain work claimed by longshoremen which work was to include the loading of barges owned by appellee, but because appellee had bargained with Local M–271 and the resultant agreement had assigned the work of loading appellee's lumber barges to members of Local M–271, appellee refused to bargain with, and enter into any sort of a collective bargaining agreement with Local 16 or to make any agreement with Local 16 regarding the loading of appellee's lumber barges.

The first barge which was loaded (in October, 1947) by appellee's mill employees belonging to Local M–271 was unloaded at a terminal point without incident. For reasons not here involved appellee's mill was closed during the winter months of 1947–1948. In March of 1948 appellee reopened its Juneau mill operations and commenced loading operations on another barge. Members of Local 16 then called on appellee and demanded the work of loading such barges.

When appellee refused to accede to this demand Local 16, in April of 1948, picketed appellee's plant. In consequence appellee's employees with whom it then had a collective bargaining agreement refused to cross Local 16's picket line and the mill was forced to shut down. After unsuccessful efforts to bring an end to the picketing appellee finally succeeded in reopening the mill in July with a small crew but the picketing continued. International through Albright, its representative, branded the millworkers then working as "strikebreakers," and all the Canadian Locals of International were informed that appellee's products were "unfair," this information being publicized in an official newspaper published by International. Members of Local 16 refused to load appellee's products on commercial steamers. In August, 1948 a barge of lumber loaded by appellee's millworkers departed for Prince Rupert in Canada. Representatives of International and Local 16 were in Prince Rupert when the barge arrived and longshoremen in that port refused to unload the lumber, acting on orders from the headquarters of International in San Francisco. Appellee finally succeeded in getting this barge unloaded in Tacoma but when a second barge was sent to that port the following month it was discovered that that port also was "closed" and the barge was not unloaded until six months had elapsed. In consequence of these actions appellee was unable to market its lumber and it had accumulated lumber to a point where its storage space was exhausted at its mill and it was finally forced to close the Juneau sawmill in October, 1948. The mill was still closed at the time of trial.

In a trial before the lower court and a jury appellee recovered judgment against both appellants in the sum of $750,000, together with appellee's costs and disbursements to be taxed by the clerk of the court, including an attorney's fee of $10,000. This appeal followed. The judgment in the instant action recited that both of the appellants were unincorporated associations.

Appellants present their case under four specifications of error. At the outset we face appellants' contention that the District Court for the Territory of Alaska

is not "a district court of the United States" *within the meaning* of Section 303 (b) of the Act,[2] and therefore it was without *jurisdiction* to entertain and proceed with a cause arising under the Act *if it* entertained (as it did) such a cause *upon the theory* and "misconception" that in so doing it functioned as "a district court of the United States". The significance of this is to be found in the language of Section 301(b) (c) (d) which makes certain procedural provisions applicable to actions "in the district courts of the United States" and in "any court of the United States" but do not extend the same procedural techniques to any other court.[3] This contention invites an inquiry into the extent and nature of the jurisdiction conferred upon that court by Congress when it established the court as a district court for the district of Alaska, Title 48 U.S.C.A. § 101. It is to be noted that the legislation creating the court vested in it "the *jurisdiction* of district courts of the United States * * * [and] * * * general jurisdiction in civil * * * causes * * *."

Appellants' position seems to be that the proper interpretation of Section 303(b) is that the words "subject to the limitations and provisions of Section 301 hereof" (see footnote 2) apply *only* to "district courts of the United States," *and not* to "any

other court having jurisdiction of the parties". Since Title 28 U.S.C.A. (Chapter 5) does not designate the lower court as a district court of the United States appellants appear to regard it as falling within the category of "any other court having jurisdiction of the parties" and contend that if it does come within the latter designation or category then it may not lawfully apply the provisions of Section 301 of the Act but in any case under the Act it must, and can only, apply "local law," that is "Alaska law." Upon this premise it is urged that the lower court erred in adopting and applying the provisions of Section 301 of the Act which relate to matters of jurisdiction, service of process, and agency. It is argued that these provisions of the Act run counter to the law, practice and procedures recognized and applied in the courts of Alaska, and the refusal of the court to adopt and rely upon Alaska rules as to all such matters prejudiced appellants to a degree requiring reversal of the judgment.

As related to the foregoing contention appellants also take the position that under Alaska law the trial court could not acquire jurisdiction of a non-resident, unincorporated association (International) by service of process on its agent doing business in Alaska—also that under Alaska law an unincorporated association (which would

2. "(b) Whoever shall be injured in his business or property by reason or any violation of subsection (a) may sue therefor in any district court of the United States subject to the limitations and provisions of section 301 hereof without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit."

3. "Sec. 301(b) Any labor organization which represents employees in an industry affecting commerce as defined in this Act and any employer whose activities affect commerce as defined in this Act shall be bound by the acts of its agents. Any such labor organization may sue or be sued as an entity and in behalf of the employees whom it represents in the courts of the United States. Any money judgment against a labor organization in

a district court of the United States shall be enforceable only against the organization as an entity and against its assets, and shall not be enforceable against any individual member or his assets.

"(c) For the purposes of actions and proceedings by or against labor organizations in the district courts of the United States, district courts shall be deemed to have jurisdiction of a labor organization (1) in the district in which such organization maintains its principal office, or (2) in any district in which its duly authorized officers or agents are engaged in representing or acting for employee members.

"(d) The service of summons, subpœna, or other legal process of any court of the United States upon an officer or agent of a labor organization, in his capacity as such, shall constitute service upon the labor organization."

include Local 16 as well as International) cannot be sued as an entity. The claimed error on the question of agency relates to certain instructions given by the court which appellants assert were based on Section 301(e) of the Act.

Assuming arguendo that the provisions of Section 301 of the Act are applicable only in "district courts of the United States" our task is to determine whether the clearly disclosed *theory and policy* of the Act reflects an intention of Congress to *include* the Alaska court within the *meaning* of the term "district court of the United States" in order to effectuate the obvious purposes of the Act.

A fair reading of the Act in its entirety makes evident that its frequent and varied reference to federal courts lacks that exactness of expression normally employed by a legislature in utilizing words of art. The federal courts are referred to in a variety of ways and nowhere in the Act or in the Legislative History of the Labor Management Relations Act, 1947, (2 vols., published by the National Labor Relations Board) is there any indication that this variance was intended to have any controlling significance. We find in the legislative history a loose reference to federal courts which is strongly indicative of an intent to employ these terms in the Act in a comprehensive rather than in a technical sense. Had the latter usage been intended it is a rational assumption that Congress would have employed terms identifying federal courts with a more marked degree of accuracy and precision.[4]

In attempting to determine what Congress intended by using the phrase "district court of the United States", our inquiry is not foreclosed by the fact that in other legislative enactments Congress used that phrase in a technical sense. Where legislation is of the sweeping character of that before us we should not construe that language apart from the full text of the Act. We regard it as proper and necessary to interpret this phrase in light of the expressed purpose and policy of the Act.

The purpose of the Act is expressed in Section 1 of the Act. The aim of Congress was to prevent industrial strife which prevents the free flow of commerce. The second paragraph of this Section announces that the purpose and policy of the Act is to promote the full flow of commerce, to prescribe the legitimate rights of em-

4. A few examples of the use of confusing terminology in referring to federal courts further serve to exemplify the nature of our inquiry. One example is Section 301 of the Act, Title 29 U.S.C.A. § 185, paragraphs (a), (b), (c) and (d). In paragraph (a) appears the following language: "in any district court of the United States having jurisdiction of the parties". In paragraph (b) appears the following language: "Any such labor organization may * * * be sued as an entity * * * *in the courts of the United States.*" In paragraph (c) appears the following language: "For the *purposes* of actions and proceedings * * * against labor organizations in the district courts of the United States, *district courts* shall be deemed to have jurisdiction of a labor organization". The emphasized words convey a strong inference that *any federal court denominated "a district court"* would have *jurisdiction* for the purposes of actions and proceedings against labor organizations. In paragraph (d) appears the following language: "The service of summons, subpena, or other legal process *of any court of the United States* upon an officer or agent of a labor organi-

zation, in his capacity as such, shall constitute service upon the labor organization."

As a further example of the varying designations employed in the Act we note that (including the Section (303) here in question) the phrase "district court of the United States" is used six times in the Act. Sections 10(b), 208(a), 301(a), 301(b) and 301(c). "District court of the United States (including the District Court of the United States for the District of Columbia)" is the court designated three times. (Sections 10(e), 10(j) and 10(*l*)). An equal number of times Congress employed the words "courts of the United States." Sections 11(4), 301(b), and 301(d). Once Section 11(2), Congress used an *all-inclusive description*: "district court of the United States or the United States courts of any Territory or possession, or the District Court of the United States for the District of Columbia". Lastly, in Section 302(e) Congress used all the above descriptions except one: "district courts of the United States and the United States courts of the Territories and possessions".

ployers and employees in their relations affecting commerce, to provide orderly procedures for the prevention of interference with those rights, to protect the rights of individuals in their relations with labor organizations, to define and proscribe practices on the part of labor and management which affect commerce and are inimical to the general welfare, and to protect the rights of the public in connection with labor disputes which affect commerce. The term "commerce" as defined in the Act is not limited to commerce between the states but includes the territories as well. The inclusive definitive terms employed in Section 101 of the Act are also highly significant as revealing and expressing a purpose to bring all phases of Labor Management disputes within the field of this legislation.

In the aggregate these declarations proclaim with imposing and compelling force a congressional intent and purpose to formulate an over-all legislative remedy which would reach and eliminate the costly and vexatious problems and social hardships which burden commerce and are incident to, and constantly arising out of, controversies in the entire labor-management field. To us these considerations also manifest a Congressional intent to define and prescribe the legitimate rights and duties of Alaska employers and employees in the field of relations affecting commerce, and to bring this area of possible employer-employee controversies within the ambit of the Act. The Territory of Alaska is rich in resources and its varied and extensive business activities give rise to problems in the labor-management field of the same character as those which arise in continental United States. Yet if we were to accept the implications which arise from the interpretation of the Act now urged upon us by the appellants, we would have to hold that the rights of an Alaska employer (under Section 303 of the Act) while existing in theory, might, and probably would be, rights of a character incapable of real vindication or enforcement in any Alaska court for lack of an effective local enforcement remedy. One of appellants' arguments affords a ready illustration of this fact. They suggest that if "local law" of

Alaska was applied to this case neither Local 16 nor International could be sued in the lower court for the reason that both appellants are unincorporated associations and, under local (territorial) law or the common law, such associations cannot be sued, as entities. Since practically all labor organizations are "unincorporated associations" the significance of this argument becomes apparent. If it is sound, appellee is without an effective remedy under the cause of action asserted in its complaint.

As a way out of this dilemma for the appellee-employer appellants suggest that International might be sued by appellee in "a district court of the United States" at some point in continental United States where service of process upon its representatives might be effected. But ignoring for the moment the inconvenience attending such a move it would still leave appellee without a forum in which it could effectively maintain an action against Local 16.

■ Regardless, however, of the status of Alaska "local law" we cannot bring ourselves to believe that Congress framed the provisions of the Act so as to create a right of action under Section 303 but deliberately denied application of the important provisions of Section 301 in the event a cause of action was asserted in the Alaska court. The complexities (and the lack of any general rule of application) of "local law" and common law principles in relation to suits against unincorporated associations such as labor unions presented one of the serious problems receiving attention and consideration at the hands of Congress, as is clearly indicated in committee reports. See Senate Report No. 105 (by Senator Taft) Legislative History of the Labor-Management Relations Act, Vol. 1, pp. 421, 422, 423. This contemplation of the law carries the conviction that Congress clearly intended the provisions of Section 301 to be applied by the "district court for the Territory of Alaska" in actions based upon the provisions of the Act.

It is certain that Congress adopted the Act with full knowledge that the only court in the entire Territory of Alaska which

could possibly entertain and adjudicate a cause of action arising under the Act was the lower court—a federal court created by Congress and vested with the jurisdiction of district courts of the United States.[5] It is noteworthy that in referring to the right to sue a labor organization "as an entity", and to serve an "officer or agent of a labor organization," Section 301, subdivisions (b) and (d) provide for such procedures in a "court of the United States". Even if this court were not "a district court of the United States", it is unquestionably, and under any test, a "court of the United States."

No plausible or acceptable reason has been suggested to us as a basis for the conclusion that Congress intended to create the strange geographical hiatus in the law that acceptance of appellants' construction of the Act would produce. To adopt such a conclusion would require a construction of its terms so strict and narrow as to evince disregard of the dominating reasons assigned by Congress for its enactment. In short, it would mean that, for most purposes, the law was a dead letter in Alaska. Upon at least two occasions the Supreme Court refused to construe the literal language of statutes in a manner which would disregard and thereby frustrate the obvious purpose and policy of the legislation involved and produce unreasonable or absurd results.[6] We adopt the rationale of the rule applied in these cases.

5. Title 48, Section 101.

6. United States v. American Trucking Ass'ns, 310 U.S. 534, 543–544, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345.

"There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' this Court has followed that purpose, rather than the literal words. When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.' The interpretation of the meaning of statutes, as applied to justiciable controversies, is exclusively a judicial function. This duty requires one body of public servants, the judges, to construe the meaning of what another body, the legislators, has said. Obviously there is danger that the courts' conclusion as to legislative purpose will be unconsciously influenced by the judges' own views or by factors not considered by the enacting body. A lively appreciation of the danger is the best assurance of escape from its threat but hardly justifies an acceptance of a literal interpretation dogma which withholds from the courts available information for reaching a correct conclusion. Emphasis should be laid, too, upon the necessity for appraisal of the purposes as a whole of Congress in analyzing the meaning of clauses or sections of general acts. A few words of general connotation appearing in the text of statutes should not be given a wide meaning, contrary to a settled policy, 'excepting as a different purpose is plainly shown.' "

Talbott v. Board of County Com'rs Silver Bow County, 139 U.S. 438, 441, 442, 443, 11 S.Ct. 594, 595, 35 L.Ed. 210.

"In this section no express reference is made to territories; states only are mentioned. Tested by the letter, the argument is short and clear. Congressional permission is essential; no permission is given to the territories; therefore territorial taxation is unauthorized and void. Whatever may be the voice of the letter, the argument fails because the minor premise cannot be sustained. Can it be that congress meant to give power to the states to tax, and to withhold that power from the territories? Some plausible reason should be suggested before the intention is imputed to congress of granting to an independent jurisdiction, such as a state, the power to tax one of its own instrumentalities, and at the same time withholding a like power from a political organization like that of a territory, wholly dependent upon congress, and subject to its absolute supervision and control. Such is not the ordinary lesson of experience. If the matter in respect to which such an intent was imputed were wholly of interest to the states, or designed purely for the exer-

The spirit, tenor and purport of the Act also convince us that Congress intended to bring *all* aspects of labor-management relations in Alaska which affect commerce within the ambit of the Act. We are persuaded that the lower court had jurisdiction to entertain and adjudicate the instant cause and to apply the provisions of Section 301. We further hold that Congress intended the language of Section 303 (which refers to district courts of the United States) to embrace and include "the district court for the Territory of Alaska." And in this connection we are generally in accord with the opinion expressed by the trial court on the subject of the jurisdiction of that court as related to the issues in this case.[7]

The provisions of Section 301 of the Act being applicable to this action, the trial court correctly determined the issues raised in regard to the jurisdiction of the court over the defendants and in regard to the type of service of process authorized by the Act. It is conceded that Vern Albright was an International representative and that he was engaged in acting for employee members. By virtue of Section 301(c) the court had jurisdiction of the International and by virtue of Section 301(d) the service of process on Vern Albright constituted service on the International. The agency question is treated later in this opinion.

Appellants' first assignment of error and the one we treat second herein is that a Board determination under Section 10(k) of the Act is a jurisdictional prerequisite to a civil action for damages under Section 303(a)(4). This contention is based on what appellants term the inter-relation between Sections 10(k), 8(b)(4)(D), and 303 (a)(4) of the Act. Appellants' argument may be summarized as follows:

Whenever a charge is filed under Section 8(b)(4)(D) of the Act (jurisdictional dispute) the Board is required to hold a Section 10(k) hearing, and to determine therein *who is entitled to the disputed work.* This is a field in which the Board must employ its expert knowledge of labor-management relations based on such factors as history, tradition, etc. Therefore, it is urged, the only conduct which can violate Section 8(b)(4)(D) is conduct which oc-

cise of powers within the states, then properly all general expressions in the statute might be limited to states, and the intent of congress be supported and established by the character of the subject-matter of the legislation. The converse of this is true. The national banking system was national in its design, coextensive in its operation with the territorial limits of the United States, and intended to be the banking system for the whole country, territories as well as states. * * *

"These various provisions, scattered through the entire body of the statute respecting national banks, emphasize that which the character of the system implies,—an intent to create a national banking system coextensive with the territorial limits of the United States, and with uniform operation within those limits, to establish everywhere throughout the United States banks with the security which a national examination gives, and furnish a currency of uniform value, the same in Arizona as in New York, in territory as in state. Given a system of such national character, and such uniform and universal operation through the entire territorial limits of the country, before any particular section of the stat-

ute creating it shall be tortured into creating a discrimination and difference in privileges and burdens by reason of locality, its language must imperatively demand such construction."

And see the reasoning in such cases as The Maret, 3 Cir., 145 F.2d 431, 436, Note 28; Andres v. United States, 333 U.S. 740, 745, 68 S.Ct. 880, 92 L.Ed. 1055; Stainback, Governor, v. Mo Hock Ke Lok Po, etc., 336 U.S. 368, 378, 379, 69 S.Ct. 606, 93 L.Ed. 741.

7. Congress had the power to confer, and did confer, "general jurisdiction" upon its creature, the district court of Alaska. In view of the plenary power of Congress to confer such jurisdiction upon an inferior court it creates, we think that as to the jurisdiction thus conferred, it is not necessary to consider (and decide) whether or not, strictly speaking, the lower court is a "constitutional" or a "legislative" court. See opinion by Judge Folta, 83 F.Supp. 224, where he discusses the status of the lower court and the issue of jurisdiction. See also Senate Document 232, 74th Congress, 2nd Session, page 547, published in 1938 under the title "Constitution of the United States of America."

curs *after* a Board determination under Section 10(k) and which violates the Section 10(k) order. Since the language of Section 303(a)(4) is practically identical with that of Section 8(b)(4)(D), it follows that there can be no action for damages under the former Section until after a Section 10(k) determination. To buttress this argument appellants suggest several incongruous results which might occur if the courts were to proceed with a private damage suit prior to action by the Board under Section 10(k). It is further urged by the appellants that the amended complaint in the instant case is fatally defective in that it fails to allege that a 10(k) determination adverse to appellants had been made, and that the court did not consider this omission as an essential element of appellee's cause of action. Therefore, whether it be considered a lack of jurisdiction, or failure to state a cause of action, the judgment is erroneous and should be reversed.

■ We do not agree. No such limitation appears expressly in Section 303(a)(4). Section 10(k) provides that whenever an unfair labor practice charge is filed under Section 8(b)(4)(D) the Board is "empowered and directed to hear and determine the dispute * * *." There is no reference in Section 10(k) to Section 303(a)(4). The argument of appellants rests primarily on identical language of Section 8(b)(4)(D) and Section 303(a)(4) and on the fact that a special procedure is set out in the Act for determining jurisdictional disputes.

The difficulty with the position of the appellants is that it is inconsistent with the plain language of Section 303(a)(4). That Section provides:

"Section 303. (a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commod-

ities or to perform any services, where an object thereof is—

\* \* \* \* \* \*

"(4) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class unless such employer is failing to conform to an order or certification of the National Labor Relations Board determining the bargaining representative for employees performing such work. Nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under the National Labor Relations Act."

As we view this Section of the Act, a plaintiff, to maintain an action for damages, is required to show that a labor organization has engaged in or induced the employees of any employer to engage in a strike, etc. and that an object of such conduct was to force or require any employer to assign particular work to employees in a particular labor organization or group rather than to employees in another group; and further that the employer is not failing to conform to a Board order or certification determining the bargaining representative for employees performing such work. All of these requirements were adequately pleaded and proved in the instant case.

Whether any of the incongruous results that appellants suggest would result from a court action prior to a Section 10(k) hearing depends to a large extent on the scope of the Board's determination under this Section. Appellants claim that the Board must decide (on the basis of past practice, tradition, etc.) what organization is entitled to the work. Appellee claims that the Board performs a purely ministerial function, and, once the employer has made an assignment, the Board cannot change it. A third possibility that has been suggested is that the Board is not required

to hold a Section 10(k) hearing in every case where a charge is filed under Section 8(b)(4)(D) but should do so only when the dispute is one which was contemplated by this Section as originally proposed, i. e., a dispute between two labor organizations where the employer is strictly neutral.[8]

Our attention has been called to several decisions of the Board. The Board has taken the position that when a prima facie case of a violation of Section 8(b)(4)(D) appears the Board *is required* to hold a Section 10(k) hearing.[9] However, the Board, with one exception, has not attempted to change an assignment made by the employer. The exception noted is the case of Winslow Bros. & Smith Co., 90 NLRB No. 188. In that case the dispute was between two unions and the employer had several times bowed to the demands of each union assigning the work first to one and then to the other. He was in doubt about which union's contract covered the work and took a position of neutrality in the hearing before the Board. · In all other cases where the employer has made an assignment the Board has upheld his right to do so. In Juneau Spruce Corp., supra, the Board said:

"As we read Sections 8(b)(4)(D) and 10(k), these Sections do not deprive an employer of the right to assign work to his own employees; nor were they intended to interfere with an employer's freedom to hire, subject only to the requirement against discrimination as contained in Section 8(a)(3)."[10]

.The instant case presents an entirely different picture than the Winslow case, supra. Appellee is not in the position of an employer standing neutral in a dispute between two unions. Appellee purchased the assets only of its predecessor and in the purchase transaction specifically provided that it was not assuming any labor contracts. A contract was negotiated with the Woodworkers Union and it was understood that the contract covered the now disputed work of loading the barges. On several occasions members of Local 16 were used to load vessels of customers of appellee but were never used to load the barges of appellee. Appellee has always insisted that the work be done by the Woodworkers Union, even in face of the fact that that organization was at one time willing to surrender the work to appellants. Far from being neutral appellee has consistently maintained the position that the Woodworkers contract be lived up to. Appellee is not failing to conform to a Board order or certification. In view of these circumstances and under the plain language of Section 8(b)(4)(D) we are unable to see how the Board in a Section 10(k) proceeding could make a determination adverse to the assignment of the work by appellee.

Turning now to Section 303 the legislative history of that Section discloses that

---

8. This was the position taken by two dissenting members of the Board in Moore Drydock Co., 81 NLRB 1108 and in Juneau Spruce Corp., 82 NLRB 650. Section 8(b) (4) (D) as originally introduced referred only to disputes between labor organizations and did not contain the language relating to an assignment by the employer. Section 10 (k) remained unchanged during its legislative course except in one respect not material here. The end result is that Section 10(k) indicates that the Board should decide who is entitled to the work while Section 8(b) (4) (D) indicates that the employer has the right to assign the work.

9. Moore Drydock Co., 81 NLRB 1108; Juneau Spruce Corp., 82 NLRB 650.

See also Herzog v. Parsons, 86 U.S.App. D.C. 198, 181 F.2d 781.

10. See also the decisions of the Board in United Brotherhood of Carpenters and Joiners of America, et al. (Stroh Brewery Co.) 88 NLRB No. 169; United Brotherhood of Carpenters and Joiners of America, AFL et al. (New London Mills Inc.) 91 NLRB No. 86; Truck Drivers and Chauffeurs Union etc. (Direct Transit Lines, Inc.) Case No. 13–CD–13, decided January 30, 1951. In the Direct Transit Lines case the Board said:
"* * *. Consequently, in determining this dispute, it is sufficient on the facts before us that the Company assigned the work to its own employees and that Local 705 acted to force or require the Company to assign this work to their own members."

it was offered in the Senate as a substitute for an amendment offered by Senator Ball. The discussion attending Senate action on these two proposed amendments indicates that the purpose was to provide some means of direct action by an employer without waiting for, or resorting to, administrative proceedings. Nowhere in the legislative history do we find any indication of an intent to have such civil actions for damages await the outcome of proceedings of the NLRB. The plain purpose was to provide direct court action by the injured party as a further deterrent against engaging in the prohibited conduct.[11]

Neither the legislative history nor the plain language of Section 303(a) (4) sustains appellants' position. The complaint in the instant case was drawn substantially in the language of that Section. We hold that a Section 10(k) determination is not a jurisdictional prerequisite to maintaining the instant cause of action.

The third assignment of error relates to the court's instructions to the jury and to appellants' proposed instructions which were refused. Appellants' first claimed error is in regard to the court's instruction No. 4. It is asserted that the trial court embodied in that instruction the language of Section 301(e) of the Act which section appellants contend is not applicable in the instant case. Since we have heretofore decided this question adversely to appellants' theory no further discussion of this point is necessary.[12]

The next alleged error is in regard to instructions 6 and 7. These instructions are set out in the margin.[13]

11. Legislative History of the Labor Management Relations Act, Vol. 2, pp. 1323–1400.

12. Appellants point out that instruction 4 referred to Albright and Barry as officers rather than employees. We hardly see how this could be prejudicial as they were in fact agents and the trial court referred to them as officers only as a step to classifying them as agents.

13. No. 6
"If you find from a preponderance of the evidence that during the period stated the defendants, acting separately or jointly, engaged in or induced or encouraged plaintiff's employees at Juneau, Alaska, to engage in, a concerted refusal in the course of their employment to manufacture, process, transport or otherwise handle or work on any lumber, or to perform any services for the plaintiff, and that the object thereof was to force or require the plaintiff to assign the work of loading its barges with its lumber to members of Local 16 rather than to other persons to whom such work had been assigned, and that such acts directly and proximately caused pecuniary loss to the plaintiff, your verdict should be for the plaintiff in such amount as you find it has been damaged, not exceeding in any event the amount sued for. On the other hand, if you do not so find, your verdict should be for the defendants.

"In this connection you are instructed that, if you find from a preponderance of the evidence that the defendants, through their officers or agents acting within the scope of their employment, entered into a conspiracy or understanding to commit the aforesaid acts or any of them for the object or purpose stated, or acted jointly or in pursuance of a common purpose or design, then from the time of entering into such a conspiracy or understanding everything that was done, said or written by any of the officers or agents of either in furtherance of such conspiracy or understanding and to effect the object or purpose thereof, regardless of whether done, said or written in Alaska or elsewhere, is binding on both of the defendants just as though they themselves, through their officers or agents, had done such acts or made such statements, and if the object of the conspiracy was accomplished, resulting in damage, each is liable for the whole thereof regardless of the degree of participation in the commission of the acts charged, or any of them.

"A conspiracy, common purpose or design may be proved by direct evidence or by proof of such circumstances as naturally tend to prove it and which are sufficient in themselves to satisfy an ordinary prudent person of the existence thereof. Therefore, it is not necessary that such a combination or understanding be shown to be in writing. It is sufficient if the evidence shows a combination of or cooperation between two or more persons to accomplish a common purpose.

"On the other hand, if you find that the defendants did not act in concert or in pursuance of a common purpose or design, you will consider the case against

It is contended by appellants that before *either* appellant could be held liable the evidence must establish that *its agents* engaged in the proscribed activity and that it was bound by the acts of its agents. It is asserted that instructions 6 and 7 allowed the jury to consider a basis for International's liability on a much broader ground than the agency theory of liability; that the jury was permitted to find International liable for the actions of Albright (an International representative) without regard to the scope of his authority, and that the combined effect of instructions 6 and 7 was to nullify the agency principles set out in instruction No. 4. We do not so read the instructions.

Instruction 6 permitted the jury to find that if appellants entered into a conspiracy or understanding to commit the acts complained of in the complaint, then either of appellants could be liable for the whole of the resultant injury regardless of which of the appellants (acting through their agents) actually performed the acts in furtherance of the conspiracy. The instruction permitted the jury to determine whether the agents of the defendants, acting within the scope of their authority, did enter into the conspiracy or understanding to commit the acts complained of. The effect of this instruction was that either of appellants could be held liable *only* if their agents acted within the scope of their authority. Nor was there error in the use of the word conspiracy. Conspiracy was not the gravamen of the charged offense and it was not necessary to allege it in the complaint. Instructions 6 and 7 were based on the well established principle of tort law that where two persons act in concert to commit a wrong each is liable for the entire injury resulting therefrom and that one who abets a wrongful act is equally liable with the perpetrator.[14] There was sufficient evidence before the court of such an understanding between Local 16 and International on which to submit the matter to the jury for its determination.

Appellants also assign as error certain supplemental instructions given by the trial court. The first of these is that a verdict was directed against Local 16 save and except for the question of damages. The evidence leaves no doubt that Local 16 actually engaged in the proscribed activity for the purpose alleged in appellee's complaint, and a directed verdict against it was proper.[15]

each defendant separately, and you may find either or both or neither of them liable."
No. 7

"You are instructed that two or more persons or organizations may participate in a wrong although they do so in different ways, at different times and in unequal proportions. One may plan and the other may be the actual instrument in accomplishing the mischief, but the legal blame will rest upon both as joint actors. Accordingly, one who directs, advises, encourages, procures, instigates, promotes, aids or abets a wrongful act by another is as responsible therefor as the one who commits the act, so as to impose liability upon such person to the same extent as if he had performed the act himself."

14. Restatement of Torts, Sec. 876(a); Cooley on Torts, 4th Edition, Vol. 1, Secs. 74 and 85; See also International Brotherhood of Electrical Workers, Local 501 v. N. L. R. B., 2 Cir., 181 F.2d 34, at page 38.

15. In our view the evidence in this case fully justified the trial court in directing the verdict against Local 16 except as to the amount of damages. It also leaves no doubt of the active participation of Albright (who was concededly an employee of International) in the unlawful activity engaged in by Local 16. The only question remaining as to International's liability with respect to the conduct of Albright is whether the latter was acting in the premises as an agent of and for and on behalf of International, or solely on behalf of and as an agent of Local 16. Whether Albright was or was not acting within the scope of his employment as an employee (agent) of International (the evidence on this point being in direct conflict) tendered an issue properly submitted to the jury under correct instructions. The contention of appellee that Albright was also acting on behalf of International finds support in evidence which the jury could have accepted as fully establishing that International was here participating in the activities of Local 16 because it was very

We have examined all of the other claims of errors in the court's instructions and supplemental instructions and find them to be without merit. The jurors were instructed to consider the instructions as a whole, and so considered, the instructions were correct.

■ Appellants requested the court to give certain instructions which would have set out the policy of the Labor Management Relations Act in respect to settlement of labor disputes. These, appellants assert, would allow the jury to consider appellee's "uncompromising attitude" in regard to negotiating a settlement this as a defense by appellants or in mitigation of damages. This contention assumes that appellee had a duty to bargain with appellants in an effort to reach a settlement. Such is not the case. Appellee, who had a contract with the International Woodworkers of America covering the same work, was under no duty to bargain with appellant with respect to such work nor bow to appellants' demands in order to minimize its damages. The instructions were properly refused.

■ The next claimed error is the failure of the trial court to comply with appellants' request that the provisions of Section 8(c) of the Act be embodied in an instruction to the jury.[16] The cases dealing with this question have held that conduct which violates Section 8(b) (4) of the Act is not conduct protected by Section 8(c).[17] But we need not reach that question here as appellants made no request for an instruction based on Section 8(c). Their request to embody the provisions of Section 8(c) in supplemental instructions 3 and 4 was properly refused. Those particular instructions dealt with questions concerning the law of agency and were correct. They have no relation to the type of conduct which would be protected by Section 8(c).

The next assignment of error relates to the alleged hearsay testimony of witness Schultz, a director of appellee corporation. Schultz testified that appellee conducted investigations to determine the possibility of getting its lumber unloaded at various ports in the United States and Canada; that these investigations revealed that the longshoremen in these various ports would not unload lumber coming from appellee's mill; that as a result of these investigations, and because there was no more room in the yard, appellee ceased operations at its mill. The testimony of Schultz revealed that the investigations were in part at least conducted by others and reported to the witness. These reports by others are the basis of the hearsay objection made at the trial and now urged as error on this appeal.

■ We are of the opinion that the testimony was competent. Schultz was testifying on the damages suffered by appellee as a result of appellants' conduct. It is conceded that appellee had a duty to minimize its damages, or in other words,

much concerned with the problem of preventing appellee from using the services of regular mill employees to load its own barges and was seeking to prevent such a practice from becoming a "precedent" which might be adopted by like employers in other Pacific Coast ports located within the jurisdiction of International.

16. "Sec. 8(c) The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit."

17. These decisions rest on a variety of grounds. See Printing Specialties and Paper Converters Union, Local 388, AFL v. Le Baron, 9 Cir., 171 F.2d 331; Le Baron v. Los Angeles Building and Construction Trades Council, D.C., 84 F. Supp. 629, affirmed per curiam, 9 Cir., 185 F.2d 405; United Brotherhood of Carpenters and Joiners of America v. Sperry, 10 Cir., 170 F.2d 863; International Brotherhood of Electrical Workers, Local 501 v. N. L. R. B., 2 Cir., 181 F.2d 34; N. L. R. B. v. United Brotherhood of Carpenters and Joiners of America, 8 Cir., 184 F.2d 60. And see also discussion of this problem in 64 Harvard Law Review 781 at page 807.

192

keep operating if it was reasonably possible to do so and the purpose of this testimony was to show that appellee attempted to keep operating by investigating all possible outlets for its lumber through Puget Sound Ports and that the investigation revealed that no such outlets existed. Relying thereon, appellee ceased operations.

The results of the investigation were admissible, not as proof of the truth that the ports in question were in fact closed to appellee, but only to show that appellee, relying on such reports, acted in a reasonable manner in closing its mill. Appellee had a right to rely on reports made by responsible people whom it had asked and trusted to conduct such investigation. The truth or falsity of the reports is not in issue. The statements were competent and admissible.

■■■ The remaining assignments of error relate to appellants' exhibit C which is a contract between Local 16 and the Waterfront Employers Association of Juneau. By its instructions to the jury the court held as a matter of law that this agreement was not binding on appellee and refused to allow this exhibit to go to the jury except for the limited purpose of showing that such an agreement had existed between Local 16 and Juneau Lumber Mills prior to the time appellee purchased the mill assets from that concern. We think that this ruling was correct. Appellee had purchased only the physical assets of Juneau Lumber Mills and the purchase agreement specifically negated the assumption of any labor agreements. No evidence was offered that this purchase agreement was not made in good faith. The purchase of the assets of a corporation does not establish acceptance of a labor agreement of the seller, Empire Case Goods Workers Union v. Empire Case Goods Company, 271 App.Div. 149, 63 N.Y.S.2d 35. The evidence is conclusive that at the time of the sale transaction between appellee and Juneau Lumber Mills the employees of the latter concern were notified by signs posted at the mill where they worked that their employment was terminated, and appellee posted notices that its office would be open

within a day or two for signing up for employment the former employees of Juneau Lumber Mills. Sometime later appellee and the Woodworkers Union negotiated for and subsequently entered into a collective bargaining agreement in which the Woodworkers Union (Local M–271) was recognized as the exclusive bargaining agent for all of appellee's mill employees at Juneau. This agreement was dated November 3, 1947 and was in force at the times material to the issues in this case. It is true that members of Local 16 were hired by appellee subsequent to this time but it was only on those certain occasions when a barge or vessel of a customer of appellee was to be loaded. Local 16 members were never hired to load appellee's barges. Such intermittent hiring does not raise a jury question on the implied assumption by appellee of a contract existing between Local 16 and the former owner of the purchased mill assets. The cases cited on this point by appellants are not relevant to the facts developed in the trial of the instant case.

From a review of the entire record we are persuaded that the case went to the jury under fair instructions and that the verdict of the jury finds ample support in the facts properly admitted in evidence. The verdict should be and is affirmed.