382 F.Supp. 1258 (1973)
NORANDA ALUMINUM, INC., Plaintiff,
v.
UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, AFL-CIO, and United Brotherhood of Carpenters and Joiners of America, AFL-CIO, Local No. 618, Defendants.
No. 72 C 33(1).
United States District Court, E. D. Missouri, E. D.
December 28, 1973.
*1259 Gerald Tockman, St. Louis, Mo., for plaintiff.
Morris J. Levin, Levin & Weinhaus, St. Louis, Mo., Wm. A. McGowan, Washington, D. C., for defendants.
MEREDITH, Chief Judge.

FINDINGS OF FACT
1. Noranda Aluminum, Inc., (hereinafter referred to as "Noranda") is a domestic wholly-owned subsidiary of Noranda Mines, Ltd., a foreign corporation (which in the course of the proceedings herein agreed that all its claims, if any, against defendants are merged with plaintiff's claims and that it would be bound by these proceedings and the findings and judgment of this Court).
2. Noranda was incorporated in Delaware in 1968 to establish and operate a 200-acre primary aluminum smelter in New Madrid County, Missouri.
Noranda entered into a contract with Kaiser Engineers, Inc., (hereinafter referred *1260 to as "Kaiser") for the engineering design and construction of its smelter on a cost-plus-fixed-fee basis.
The contract called for the design and construction of a smelter consisting of 174 reduction cells or "pots" with a capacity of 70,000 tons per year production of primary aluminum.
3. Under the contract between Noranda and Kaiser, the employment of all subcontractors and building and construction trades employees, as well as the work tasks to be performed by those subcontractors and employees, were to be and were performed and determined by Kaiser.
In the performance of its contract with Noranda, Kaiser set up a field construction staff at the site in New Madrid County, Missouri, to manage, direct, and support direct construction activities. This construction staff assigned work to and supervised the work performed by the laborers, pipefitters, painters, teamsters, teamster operators, operating engineers, surveyors, boilermakers, cement masons, carpenters, millwrights, and ironworkers directly employed by Kaiser, as well as the electricians employed by Kaiser's electrical subcontractor, Comstock-Roper, and other subcontractors employed from time to time by Kaiser.
4. Pursuant to its collective bargaining agreements with international building and construction trades unions, Kaiser conducted a pre-job conference at the construction site in February 1969, before actual construction activities began. At this meeting, attended by both international and local representatives of the various trades involved in the work, Kaiser agreed to observe the terms and conditions of employment established by the various trades in the Southeast Missouri building trades area.
5. Pursuant to its collective bargaining agreements with the respective international building and construction trades unions, Kaiser obtained craft employees using the local labor organizations of the respective internationals as a hiring hall source for employment and first construction activities began in March 1969.
6. In July 1969, Kaiser held several "mark-up" meetings to review local area and trade practices with respect to the assignment of work among the trades in the construction of the smelter. At these meetings, attended by both international and local representatives of the various building and construction trades, claims to particular work performance and items of equipment were asserted by the respective international and local representatives. Following these meetings, and on August 25, 1969, Kaiser issued a Summary of Work Assignments to the international and local union representatives in attendance at the July 1969 meetings.
7. Kaiser's August 25, 1969, Summary assigned certain "systems" in the various facilities comprising the aluminum smelter to pipefitter members of the United Association of the plumbing and pipefitting industry of the United States and its Local Union No. 562. The Summary assigned to millwright members of the United Brotherhood of Carpenters and Joiners of America and its Local 618 certain equipment items known as dry material handling rack and pinion gates and dry material handling chutes; in the case of the latter equipment items, the assignment was in terms of a local ironworker-millwright agreement.
8. In late June 1970, Carpenters Local 618 representative, J. D. Morris, complained to Kaiser that pipefitters were performing work on rack and pinion gates and material handling chutes that had been assigned to millwrights in the August 25, 1969, Summary. On July 8, 1970, international and local representatives of the millwrights and pipefitters met with Kaiser to discuss the dispute. Failing agreement the international representatives involved agreed and informed Kaiser that the dispute would be referred for determination by a special joint committee established by the United Brotherhood of Carpenters *1261 and the United Association to resolve jurisdictional disputes between the trades without resort to the procedures of the National Joint Board for the settlement of jurisdictional disputes. On July 16th, however, the United Brotherhood also complained to the National Joint Board.
9. In November 1969 and January 1970, Ray Brown, the millwright steward, informed Kaiser that he and United Association Local 562 steward, DeWeese, had worked out an arrangement covering the installation of rack and pinion gates and material handling chutes which would cause "no problems" on the Noranda job. Other such arrangements in the past had been worked out between various crafts on the job from time to time.
10. The millwrights and pipefitters continued to work on rack and pinion gates and material handling chutes at the Green Carbon Plant in the period July 3-July 28, 1970.
11. At some time before July 28, 1970, Carpenters Local 618 business representative Morris, a representative of a carpenter type of local who did not know or understand millwright work, contacted Frederick Bull, the General Executive Board member of the United Brotherhood, who had been assigned by the United Brotherhood to advise and assist Morris as the international union's jurisdictional expert on millwright work. Morris described to Bull the work activities, as reported by Brown, being performed by pipefitters on rack and pinion gates and chutes at the Green Carbon Plant. On the basis of Morris' descriptions, Bull informed Morris that pipefitters were performing work on gates and chutes at the Green Carbon Plant that belonged to millwrights under the August 25, 1969, assignments and in accordance with the claims of trade autonomy contained in the Constitution of the United Brotherhood of Carpenters.
12. On July 28, 1970, Morris confronted Al Gordon, a representative of Kaiser's labor relations department in charge of the handling of jurisdictional disputes, and demanded that Kaiser take pipefitters off the work they were then performing on gates and chutes at the Green Carbon Plant and place millwright members of the United Brotherhood of Carpenters and its Local 618 on the work; Morris stated that he had talked with the International and had his instructions. At the time of this conversation, neither Morris nor the United Brotherhood of Carpenters nor millwright steward Brown, upon whose observations the demand was based, were aware that millwrights, in fact, were performing final installation work on Green Carbon Plant gates and chutes or that they had been doing so since July 3, 1970, along with pipefitters. Morris, however, demanded the removal of pipefitters from the work and requested Gordon to contact the General Office of the United Brotherhood of Carpenters concerning Morris' instructions. Gordon then telephoned the General Office of the United Brotherhood of Carpenters and talked with Jimmy Jones, the assistant to General President Hutcheson and the United Brotherhood's international representative in charge of its jurisdictional office. Jones, as had General Executive Board member Bull on several occasions in the past, demanded that Kaiser take pipefitters off the work they were then performing on Green Carbon Plant gates and chutes and replace them with millwrights, threatening trouble on the job if Kaiser did not comply with Jones' demand. Jones then instructed Morris, in the hearing of Gordon, that if Kaiser did not remove pipefitters and replace them with millwrights on the disputed work, Morris had authority to exercise his prerogative, which included a strike and picket line under the provisions of the United Brotherhood's Constitution for job or shop strikes.
13. As of the July 28, 1970, meeting between Gordon and Morris, Kaiser had not received any determination of the dispute between the United Association and the United Brotherhood of Carpenters from the special jurisdictional committee *1262 of those two internationals to which the dispute had been referred on July 8, 1970, and had received no job decision from the National Joint Board for the settlement of jurisdictional disputes with regard to the dispute between United Association and the United Brotherhood. Gordon explained to Morris that in the absence of any determination from either the special jurisdictional committee or the National Joint Board, Kaiser could do nothing to change the way in which work on rack and pinion gates and chutes was then being performed by both pipefitters and millwrights other than to direct discontinuance of all work on rack and pinion gates and chutes at the Green Carbon Plant. Gordon then informed Morris that United Association Local 562 business representative Steska would be at the jobsite for another jurisdictional meeting on July 29, 1970, and at that time Gordon would attempt to set up a meeting between Steska and Morris in an effort to resolve the problem at the local level. Morris agreed to meet with Steska, which to that date he had refused to do, because the dispute was pending before the international's special jurisdictional committee. Gordon issued instructions that neither pipefitters nor millwrights were to perform any further work on rack and pinion gates or chutes at the Green Carbon Plant until after the proposed meeting between Steska and Morris on July 29th.
14. Due to a mix-up in schedules, Morris did not meet with Steska at the jobsite and refused to meet with Steska at Morris' home, since Morris had already informed the other construction trades on the project that a strike and picket line would occur on July 30, 1970.
15. At the beginning of the workday on July 30, 1970, members of the United Brotherhood of Carpenters and members of the United Brotherhood of Carpenters Local 618 went out on strike and picketed the Noranda construction project. During the continuance of the strike and picketing, both Kaiser and the National Joint Board repeatedly requested General President Hutcheson to direct cessation of the strike and picketing and to either adjust the dispute directly with the United Association or by submission for decision to the National Joint Board. Although General President Hutcheson could easily have done so, neither he nor the United Brotherhood of Carpenters at any time attempted to bring a stop to the strike and picketing. The picketing ended on August 13, 1970, following the filing of the lawsuit in this case, and was brought to an end by the instructions of Carpenters' General Executive Board member Bull. After the strike and picketing ended, and in October 1970, the dispute over rack and pinion gates and material handling chutes at the Green Carbon Plant was settled by agreement between Carpenters Local 618 representative Morris and United Association Local 562 representative Steska in a meeting attended by Carpenters' General Executive Board member Bull, who regularly attended such meetings in participation with Morris and in order to advise and assist Morris. The resulting agreement adopted the agreement between the St. Louis District Council of the United Brotherhood of Carpenters and the United Association Local 562, and provided that work on rack and pinion gates and material handling chutes would be performed by pipefitters and millwrights in exactly the same way it was performed in the period July 3-July 28, 1970.
16. As of July 30, 1970, construction craft manpower, consisting of the employees of Kaiser, the employees of Comstock-Roper, and the employees of ten fixed-price subcontractors actively at work on the project, was at its peak of about 1,386. As of this date, with the physical areas of many of the facilities more than fifty percent complete, construction activities on plant areas critical to first metal and Noranda's start-up of production were on schedule for the first smelting of primary aluminum on January 23, 1971. Taking into account the twenty-five strike interruptions which preceded the July 30th strike and *1263 the fifty-seven percent level of productivity of all crafts employed on the project, the status of construction activities and the schedule manning were timely to the start-up and operation of 174 pots by Noranda on January 23, 1971, and, for these purposes, Noranda was in the process of training a production staff for first operations.
17. When the strike began on July 30th, and through the date of its discontinuance at the end of the workday on August 13, 1970, painters, cement masons, carpenters, millwrights, ironworkers, and boilermakers refused to cross the picket line and perform any work. Following termination of the strike and picketing on August 13, 1970, the construction work forces were not remobilized and reorganized to their pre-strike levels until August 27, 1970.
18. Kaiser made a detailed study of the effect of the strike's interruption and impact on the construction schedule and the first metal date of January 23, 1971, which would have occurred but for the strike interruption of July 30th. This study, completed about October 1970, showed that as a result of the man-hours lost during the period of the strike and picketing and the remobilization and reorganization following it and the impact of those work losses on schedule, first metal on the basis of the original plan of 174 pots could not be reached until October 1971, a delay of nine months in Noranda's start-up.
19. In order to minimize its delay in getting into production, Noranda accepted the recommendation of Kaiser to begin production with 88 pots and without the use of the planned Green Carbon, Anode Press and Metal Services Areas.
20. An overtime program implemented following the July 30-August 13, 1970, strike and picketing succeeded in limiting the delaying effect of the strike to thirty-three calendar days for first metal on this modified 88-pot basis without the Anode Press, Green Carbon and Metal Services Area.
21. However, by reason of defendants' wrongful and illegal conduct in striking and picketing for the objective of forcing a work assignment, and as a result of such conduct, plaintiff suffered injuries in the following amounts:
(a) $13,534.23 incurred and paid in salary and expense amounts and attorneys' fees for activities directed to bringing a stop to the strike and picketing;
(b) $25,147.15 in railway car demurrage, truck detention, warehousing costs, and material rehandling costs, all as a result of the strike and picketing and the unavailability of craft labor forces to unload or receive railway cars and truck trailers;
(c) $693,090.10 in increased overtime premium payments to work the man-hours lost by the craft construction employees of Kaiser Engineers, Inc., Comstock-Roper, and fixed price subcontractors during and as a result of the strike and in an effort to limit the impact and effects of the strike and picketing;
(d) $31,752.47 for the rental and depreciation costs of construction and office equipment required to be kept on the job an additional 33 calendar days as a result of the strike and picketing, which was the last work interruption on the job;
(e) $57,216.15 in salaried and utilities overhead paid to cost-plus-fixed-fee contractors required to be kept on the job an additional 33 calendar days because of the strike and picketing, which was the last strike and picketing or work interruption on the job;
(f) $94,083.44 consisting of $35,566.00 in additional construction and raw material costs incurred to minimize start-up delay and to limit the impact of the strike and picketing on production start-up to 33 calendar days and $58,517.44 in salaried and utility overhead payments for a trained production staff forced to remain idle and non-productive because *1264 of the 33 calendar day delay in start-up caused by the strike and picketing;
The total of these amounts is $914,823.54 and a judgment will be entered for the plaintiff and against both defendants.
22. Defendants particularly contend that the international union should not be held liable for any amount because they did not call the strike. They also contend that the damages were partially caused by a three-day strike of the laborers in July of 1970; that the premium time of $295,290.00 paid to the electricians was not caused by the strike. The Court rejects all of these contentions.
23. The plaintiff asks for additional damages of interest on the damages from the time incurred to the date of judgment; attorneys' fees on the bringing of this suit in a reasonable amount; loss of cash flow caused by the strike over a period of twenty-two years in the sum of $551,574.15. The Court rejects all of these contentions.

CONCLUSIONS OF LAW
1. The Court has jurisdiction of this cause under section 303 of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 187.
2. The plaintiff, Noranda, has standing to bring this lawsuit for injuries to it by reason of violation of section 8(b)(4)(D) of the Labor Management Relations Act, 29 U.S.C. § 158(b)(4)(D).
3. The United Brotherhood of Carpenters and Joiners of America, AFL-CIO, and the United Brotherhood of Carpenters and Joiners of America, AFL-CIO, Local No. 618 are labor organizations within the meaning of 29 U.S.C. § 152.
4. From the beginning of construction activities by Kaiser on the Noranda smelter through the completion of those activities in February 1972, representatives of the United Brotherhood of Carpenters and Joiners and representatives of the United Brotherhood of Carpenters and Joiners Local 618 acted jointly and in concert with regard to all matters of work jurisdiction under the collective bargaining agreement between the United Brotherhood and Kaiser and the trade autonomy claims of the United Brotherhood. Since the International and Local acted in concert, they are responsible for the conduct not only of their own agents but of each other's agents. Vulcan Materials Co. v. Steelworkers, 430 F.2d 446 (5th Cir. 1970).
5. On July 28, 1970, the assistant to the General President of the United Brotherhood of Carpenters, with full authority to instruct and require obedience from Carpenters Local 618, threatened Kaiser with trouble on the job if Kaiser did not remove pipefitter members of the United Association and United Association Local 562 from work then being performed on rack and pinion gates and material handling chutes on the construction site. At the same time, the assistant to the General President of the United Brotherhood of Carpenters, in no uncertain terms, advised Carpenters Local 618 that if Kaiser did not replace pipefitters with millwright members of the United Brotherhood of Carpenters and Carpenters Local 618 on the disputed work, Carpenters Local No. 618 was authorized to exercise its prerogative, which included the establishment of a strike and picket line under the provisions of the Constitution of the United Brotherhood for job or shop strikes. By thus provoking and instigating the strike and picketing which began July 30, 1970, United Brotherhood of Carpenters through its assistant to the General President, is equally liable with Carpenters Local 618 for the conduct of this strike. Longshoremen's Union v. Juneau Spruce Corp., 189 F.2d 177, 13 Alaska 291 (9th Cir. 1951), aff'd 342 U.S. 237, 72 S.Ct. 235, 96 L.Ed. 275 (1952).
6. The strike and picketing which began July 30th and lasted through August 13, 1970, was conducted under the provisions of the Constitution of the United Brotherhood of Carpenters covering *1265 assertions of Carpenters' trade autonomy and jurisdictional claims and the United Brotherhood of Carpenters, at no time during the period July 30th-August 13th, took any of the steps readily available to it to bring a stop to the strike and picketing. By this silence and inaction, the United Brotherhood of Carpenters acquiesced in and condoned the activity of Carpenters Local 618 at a time when there was full opportunity to prevent such activity or bring a halt to its effects. United Brotherhood of Carpenters is, therefore, liable as a principal actor along with Carpenters Local 618. Local 984, IBT v. Humko Co., 287 F.2d 231 (6th Cir. 1961), cert. denied 366 U.S. 962, 81 S.Ct. 1922, 6 L.Ed.2d 1254 (1961).
7. Members of the United Brotherhood of Carpenters who were not members of Carpenters Local 618 participated in the strike and picketing activities and during the course of the strike and picketing United Brotherhood of Carpenters participated with and encouraged Carpenters Local 618 in carrying out its strike and picketing activity. The United Brotherhood, therefore, is liable to the same extent as is Carpenters Local 618. Carpenters v. C. J. Montag & Sons, Inc., 335 F.2d 216 (9th Cir. 1964).
8. As of July 29, 1970, there existed a dispute between the United Association and its Local 562 and the United Brotherhood of Carpenters and its Local 618 over whether pipefitter members of the United Association or millwright members of the United Brotherhood were entitled to perform certain work for Kaiser on equipment items known as rack and pinion gates and dry material chutes. The United Association and United Association Local 562 claimed certain work on rack and pinion gates and chutes in piping systems while the United Brotherhood of Carpenters and Carpenters Local 618 claimed all rack and pinion gates and chutes whether within or without a piping system. in order to enforce their claim, the United Brotherhood of Carpenters and Joiners and Carpenters Local 618, through their respective officers, agents and stewards, engaged in a strike and picketing from July 30, 1970, through August 13, 1970, with the objective and purpose of forcing and requiring Kaiser to assign the work of installing rack and pinion gates and dry material handling chutes to employees represented by the United Brotherhood and its Local 618 rather than to employees working as pipefitter members of the United Association and its Local 562. This strike and picketing is an illegal jurisdictional dispute under 29 U.S.C. § 158(b)(4)(D) for which compensatory damages are recoverable under 29 U.S.C. 303. Carpenters v. C. J. Montag & Sons, Inc., supra.
9. This project was originally scheduled to cost $85,000,000.00, but the cost overrun exceeded the scheduled cost by approximately $22,000,000.00. Most of the overrun was due to work stoppages and labor inefficiency. The plaintiff Noranda has shown to a certainty that it sustained damages by reason of the illegal strike and picketing of the defendants in violation of the collective bargaining agreement between the United Brotherhood and Kaiser, upon which agreement the plaintiff specifically relied in authorizing Kaiser to perform construction activities on its smelter. The fact that some of the amounts of damages cannot be ascertained with certainty does not preclude recovery as to those amounts since the applicable measure of damages in a lawsuit of this kind is that of just and reasonable approximation. Mason-Rust v. Laborers, Local 42, 435 F.2d 939 (8th Cir. 1970).