**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**DALLAS GENERAL DRIVERS, WARE-HOUSEMEN & HELPERS, LOCAL NO. 745, AFL–CIO, Respondent.**

No. 17172.

United States Court of Appeals
Fifth Circuit.
March 12, 1959.

**644**

Thomas J. McDermott, Assoc. Gen. Counsel, N.L.R.B., Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Washington, D. C., Jerome D. Fenton, General Counsel, Arnold Ordman, Maurice Alexandre, Attorneys, National Labor Relations Board, Washington, D. C., for petitioner.

L. N. D. Wells, Jr., Dallas, Tex., Mullinax, Wells & Morris, Dallas, Tex., for respondent.

Before TUTTLE, JONES and BROWN, Circuit Judges.

JONES, Circuit Judge.

Associated Wholesale Grocery of Dallas, Inc., is a corporation under the laws of Texas. It is engaged in the wholesale grocery business and has its office and warehouse in Dallas. Its stock is owned by approximately 370 retail grocers of whom about two-thirds are in Dallas and the others are at North Texas points. Each stockholder has but one vote irrespective of the number of shares owned. There are nine directors, elected annually, who manage the affairs of the corporation. Although Associated sells only to its stockholders, they buy only about thirty-one per cent. of their requirements from Associated. The profits of Associated are distributed to the stockholders in the ratio of their purchases. A printing plant is operated by Associated and handbills are supplied to the stockholders who desire to purchase them. Earnings from this enterprise are distributed in the same manner as profits on merchandise transactions. Once a year Associated attempts to promote, through joint advertising campaigns of stockholding stores, the sale of goods bearing Associated's "Shurfine" label.

The respondent Union is the certified collective bargaining agent of the truckdrivers and warehousemen employed by Associated. After negotiations regarding wages and working conditions had failed to produce a result satisfactory to the Union, a strike was called on Monday, August 26, 1956. A picket line was placed at Associated's warehouse in an industrial part of Dallas. On the day the strike began the general manager of Associated sent to its stockholders a letter advising that incoming shipments and outgoing deliveries were, for the time being, being delayed and curtailed. Assistance by the stores to Associated's new employees was requested. In the

letter Associated made a request [1] of its members to come or send someone to help load or drive trucks. In response to this request ten stores supplied help to Associated. One store furnished three men, one furnished two men, and each of the others furnished one man. No men from any of the stores worked at the Associated warehouse after the first week of the strike.

The union distributed handbills at the entrances of the retail stores and in automobiles parked nearby. These handbills stated the Union's grievances against Associated and requested the public to buy elsewhere. On October 10, 1956, the Union carried an advertisement in a Dallas newspaper requesting public support of the strike.

On October 26, 1956, the Union commenced picketing at the entrances of some of the retail stores. From October 26 to November 17, 1956, eight stores were picketed. The employees carried placards reading as follows:

Notice To The Public Only
(not directed to employees of this store)
Employees Of
Associated Wholesale Grocery
Of Dallas Inc.
On Strike
This AG Member
Store Is
Unfair
Please do not buy merchandise which this store obtains from Associated Wholesale Grocery of Dallas, Inc.
Dallas General Drivers
Warehousemen & Helpers
Local No. 745, AFL-CIO

On November 17, 1956, two other stores, and on November 19, 1956, one of them, were picketed. The pickets on these occasions carried signs which read as follows:

Notice to Public and Store Owners Only
Not Directed to Suppliers or Employees
of This Store
Notice of
Associated Wholesale
Grocery of Dallas, Inc.    On Strike
Protesting Discharge of Union Members
and for a Union Contract

This store is a member-stockholder of Associated Wholesale Grocery of Dallas, Inc. from which it obtains Substantial Quantities of Groceries including all Groceries with the Shurfine label. Please do not buy groceries obtained from Associated Wholesale Grocery of Dallas, Inc. If in doubt as to which groceries are from AWG please ask the Store Manager

Dallas General Drivers And
Warehousemen Local Union
No. 745—AFL-CIO
We are not striking this store

In the first of these placards the words "On Strike" and "Unfair" were much larger than any of the other lettering. The words "not directed to employees of this store" were smaller than any of the others. The words "Notice To The Public Only", "On Strike", and "Unfair" were printed in red. The rest of the sign was in black. In the second sign the words "On Strike" dwarfed the other wording and were about four times as large as the letters of the statement "We are not striking this store." The words "On Strike" were in red. Of the ten stores picketed, four were among those which had supplied men to Associated during the first week of the strike. Each of the stores which were picketed had a rear entrance through which deliveries of merchandise were

1. "We would like for as many of our members as possible to come to the warehouse Wednesday morning at 7:30 A. M. for the purpose of helping us load our trucks, and, if any of you are truck drivers and have a license either for bobtail or trailer, we would appreciate it if you would volunteer your services until such time as we can get a permanent staff of employees to do the job. If you cannot come yourself, you may be able to send us a man to represent your store."

made. No store was picketed where deliveries of goods to the store were made through the same entrance as that used by the patrons of the store.

A complaint was made before the National Labor Relations Board by its General Counsel charging the Union with unfair labor practices within the meaning of Section 8(b) (4) (A) of the National Labor Relations Act, 29 U.S.C.A. § 158 (b) (4) (A).[2] The Trial Examiner and the Board, with one member dissenting, found that the picketing was a violation of the specified section of the Act and entered a cease and desist order. 118 N.L.R.B. 1251. The Board has petitioned this Court for the enforcement of its order.

■ The Union urges that the picketing was a concerted activity under Section 7 of the Act, 29 U.S.C.A. § 157,[3] and not a violation of Section 8(b) (4) (A). Section 7 does not sanction or authorize prohibited or illegal acts merely because they are done by persons acting in concert. International Union v. Wisconsin Employment Relations Board, 336 U.S. 245, 69 S.Ct. 516, 93 L.Ed. 651, rehearing denied 336 U.S. 970, 69 S.Ct. 935, 93 L.Ed. 1121.

■ Resisting enforcement of the Order, the Union contends that as applied to the facts here present the Order is an unconstitutional impairment of the right of free speech as guaranteed by the First Amendment. It has been stated, and we think correctly, that, "The prohibition of inducement or encouragement of secondary pressure by § 8(b) (4) (A) carries no unconstitutional abridgment of free speech." International Brotherhood of Electrical Workers v. National Labor Relations Board, 341 U.S. 694, 71 S.Ct. 954, 960, 95 L.Ed. 1299. See also Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834; Truck Drivers and Helpers Local Union v. National Labor Relations Board, 1957, 101 U.S.App.D.C. 420, 249 F.2d 512, certiorari denied 355 U.S. 958, 78 S.Ct. 543, 2 L.Ed.2d 533. There is nothing to make the case here an exception to the general rule.

■ The Union contends that the relationship between the retail stores and Associated was such as to make inapplicable the provisions of Section 8(b) (4) (A) while the contrary was found by and is here asserted on behalf of the Board. Although the Union's position is supported by a most plausible argument, we think the Board's conclusion to the contrary is sound. The fact determinations and the inferences to be drawn from them are matters which the Congress has entrusted to the Board and its findings are to be sustained when they have support in the record. See, among other cases, National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170, rehearing denied 322 U.S. 769, 64 S.Ct. 1148, 88 L.Ed. 1595; National Labor Relations Board v. Ferguson, 5 Cir., 1958, 257 F. 2d 88; National Labor Relations Board

---

2. "(b) It shall be an unfair labor practice for a labor organization or its agents—* * *

"(4) To engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person; * * * *".

3. "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section (8) (a) (3) of this title."

v. Truck Drivers & Helpers Local Union, 5 Cir., 1956, 228 F.2d 791; National Labor Relations Board v. Coats & Clark, Inc., 5 Cir., 1956, 231 F.2d 567. The Board's determination of the issue as to whether the retail stores were independent neutral employers entitled to the protection of Section 8(b) (4) (A) or were so allied with Associated as to be outside the operation of that section, may not be set aside if it has warrant in the record. Retail Fruit and Vegetable Clerks Union v. National Labor Relations Board, 9 Cir., 1957, 249 F.2d 591.

The ten retail stores which were picketed by the Union were ten of the 370, more or less, stockholders of Associated whose business policies, including its labor relations, were fixed by its board of directors. While Associated was the supplier of a substantial part of the goods sold at the retail stores, it supplied, on an average, less than a third of the goods which the retailers purchased. There was not any common control nor, as among the retailers, any common ownership. Associated had a corporate entity separate from its stockholders which is not to be ignored. We think the record sustains the Board's conclusion that the retail stores were independent neutrals and within the purview of secondary boycott provisions of the Act. J. G. Roy & Sons Co. v. National Labor Relations Board, 1 Cir., 1958, 251 F.2d 771; Retail Fruit & Vegetable Clerks Union v. National Labor Relations Board, supra; National Labor Relations Board v. Wine, Liquor & Distillery Workers Union, 2 Cir., 1949, 178 F.2d 584, 16 A.L.R.2d 762. To be sure, four of the ten picketed stores had sent men to Associated's warehouse. As to these four retailers it might be urged that they were within the rule that one who knowingly does work which would otherwise be done by the striking employees of the struck employer is not within the protection of Section 8(b) (4) (A). National Labor Relations Board v. Business Machine & Office Appliance Conference Board, 2 Cir., 1955, 228 F.2d 553, certiorari denied 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483; Douds v. Metropolitan

Federation, D.C.S.D.N.Y.1948, 75 F. Supp. 672. But this exception can hardly be held applicable where the practice was continued for only a brief interval, had ceased for a month before the picketing of the stores began, and there was no indication that the practice would be resumed. We find no error in the rejection of the "alliance doctrine" for which the Union contended.

We are urged by the Union to hold that the Board's finding that the picketing was in violation of Section 8(b) (4) (A) is not supported by substantial evidence. The Union urges that the texts of the picket signs and the displaying of them only at the customer entrances of stores having separate delivery entrances shows an absence of any intent to induce employees of the picketed stores to strike or refuse to handle goods of Associated. On the contrary, says the Union, it appears that the picketing was an activity protected by Section 7 of the Act. The picketing of Associated's warehouse had not been successful in procuring an acceptance of the Union's demands. Efforts of the Union by handbills and news paper advertising to dissuade consumers from purchasing merchandise procured by retailers from Associated had not produced the intended result. These ineffectual activities were followed by the picketing of the ten stores for the sole purpose, the Union here asserts, of discouraging the purchase by the public of the wares of Associated.

Picketing may induce action of one kind of another irrespective of the ideas which are being disseminated. International Brotherhood v. Vogt, Inc., 354 U.S. 284, 77 S.Ct. 1166, 1 L.Ed.2d 1347, rehearing denied 354 U.S. 945, 77 S.Ct. 1423, 1 L.Ed.2d 1558. "Publication in a newspaper, or by distribution of circulars, may convey the same information or make the same charge as do those patrolling a picket line. But the very purpose of a picket line is to exert influences, and it produces consequences, different from other modes of communication. The loyalties and responses evoked and exacted by picket lines are unlike those flowing from appeals by

printed words." Hughes v. Superior Court, 339 U.S. 460, 70 S.Ct. 718, 721, 94 L.Ed. 985. Here the picketing of itself might have exerted influences and produced consequences different from newspaper advertising and distribution of circulars. That the signs carried by the pickets would tend to do so cannot well be doubted. The word "Unfair" upon one form of the signs and the word "Strike" on the other were so emphasized by size and color as to suggest to those attracted to the moving picket signs that the picketed store was unfair to labor and affected by the strike. The Board found, as did its Trial Examiner, that the Union sought to achieve its objective, in part at least, through the inducement and encouragement of neutral employees to refuse to handle merchandise or perform services for their employer. The normal purpose of a picket line is to persuade employees not to cross it. If the intended effect of the picketing be a prohibited one, the lack of success in coercing the neutral employees is immaterial. National Labor Relations Board v. Associated Musicians, 2 Cir., 1955, 226 F.2d 900, certiorari denied 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483. Picketing of a neutral employee, however peaceful, is given no inherent exemption from the prohibition against secondary boycotts. International Brotherhood of Electrical Workers v. National Labor Relations Board, 341 U. S. 694, 71 S.Ct. 954, 95 L.Ed. 1299; National Labor Relations Board v. Truck Drivers & Helpers, Etc., 5 Cir., 1956, 228 F.2d 791. The record justifies the findings and inferences of the Board.

Thomas W. Jones, an employee of Associated, was among those who went out on strike. On the second day of the strike he was waiting to go on picket duty at Associated's warehouse. He told Neely, a Union steward, that he was thinking of going back to work. Neely attempted to talk him out of going back. Present in the group and overhearing the conversation between Jones and Neely were three other striking employees. One of these said he would be the first to "jump on" Jones if he went back to work and the others stated they would help, and told Jones that if they jumped on him they would beat him up so that he couldn't recognize who did it. Neely observed silence and did not repudiate the threats. Jones was out on the strike about three weeks and then returned to work. The Trial Examiner found that the Union was not responsible for the threats and that it was not incumbent on Neely to repudiate the threats of physical violence made by others. The Board, departing from the conclusions of the Examiner, held that the Union, through Neely's failure to repudiate the threats, was guilty of coercive conduct in violation of Section 8(b) (1) (A) of the Act, [4] and ordered that the Union cease and desist from threatening employees with violence if they abandon any strike called by the Union or in like manner restraining or coercing employees in their rights guaranteed by Section 7 of the Act.

Neither the Union nor its members are responsible for the unlawful acts of a member or officer of the Union in the absence of authorization or ratification of the acts or participation therein. 29 U.S.C.A. § 106; National Labor Relations Board v. Marshall Car Wheel & Foundry Co., 5 Cir., 1955, 218 F.2d 409. The authority of a Union steward to acquiesce in and to adopt, on behalf of the Union, threats made by Union members who are not officers, will not be presumed. There was no proof of authorization or ratification and hence the Board's order in this respect cannot be sustained and will not be enforced.

As to that portion of the Board's order against threatening employees with violence, enforcement will be denied; and in other respects the petition of the Board for the enforcement of its order is

Granted.

4. "It shall be an unfair labor practice for a labor organization or its agents—
"(1) To restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 * * *". 29 U.S.C.A. § 158(b) (1) (A).