273 F.2d 891
 SUPERIOR DERRICK CORPORATION, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
SEAFARERS' INTERNATIONAL UNION OF NORTH AMERICA, ATLANTIC AND GULF DISTRICT, HARBOR AND INLAND WATERWAYS DIVISION, AFL-CIO, Respondent.
 No. 17619.
 No. 17512.
 United States Court of Appeals Fifth Circuit.
 January 21, 1960.
 
 C. Paul Barker, Dodd, Hirsch, Barker & Meunier, New Orleans, La., Seymour W. Miller, Brooklyn, N. Y., of counsel, for Seafarers' International Union of North America, and others.
 Bernard Marcus, Deutsch, Kerrigan & Stiles, New Orleans, La., Eberhard P. Deutsch, New Orleans, La., of counsel, for Superior Derrick Corp.
 Allison W. Brown, Jr., Atty., Thomas J. McDermott, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Stuart Rothman, Gen. Counsel, Norton J. Come, Deputy Asst. Gen. Counsel, N. L. R. B., Washington, D. C., for National Labor Relations Board.
 Before TUTTLE, BROWN and WISDOM, Circuit Judges.
 JOHN R. BROWN, Circuit Judge.
 
 
 1
 We have again the problem of § 8(b) (4) (A) and (B) Board orders concerning secondary picketing at a so-called common situs. 29 U.S.C.A. § 158(b) (4) (A) and (B). Two separate review-enforcement cases, now consolidated here, grow out of a single Board proceeding and order. The Board, as a matter of law, declined to enjoin picketing of a railroad as the secondary employer, but forbade picketing by the Union[1] of a stevedoring company as the secondary employer.[2] Superior Derrick Corporation, the primary employer, as the charging party, dissatisfied with the former, seeks to set aside that order. The Board, as to the latter, files the conventional petition of enforcement. We agree with each petitioner.
 
 
 2
 Superior, the primary employer, owns and operates two floating derricks in the Port of New Orleans. In July 1957 the SIU commenced its still unsuccessful effort to organize Superior's employees. The picketing involved here was a part of the SIU's efforts to secure recognition for collective bargaining. That Superior's resistance has resulted in unfair labor practice charges and proceedings against it, or may eventually result in coercive Board orders, does not affect the problem of secondary picketing.[3] For the existence of a dispute between a union and the primary employer is implicit in § 8(b) (4) (A) and (B). Its purpose, stated broadly, is to prevent coercive economic pressures against neutral secondary employers being thrown into the scales in the resolution of the dispute between union and primary employer. No matter how legally unfair the primary employer's conduct may be the union may not use the weapon, either in retaliation or defense, of a proscribed 8(b) (4) (A) and (B) picket line.
 
 Charbonnet Street Wharf Picketing
 
 3
 The first picketing, although not itself the basis for a charge and complaint, was at the Charbonnet Street Wharf. There the stevedoring company engaged in discharging the vessel was the Atlantic & Gulf Stevedores, Inc., an affiliate of Superior. Consequently, as a company allied with Superior, it did not have the protected status of a secondary employer. However, the longshoremen employed by the stevedoring company were members of ILA Locals 1418 and 1419, the very locals involved in the later Dumaine Street Wharf incident. When the SIU picket appeared, the longshoremen refused to work. The Board found, and we agree, that in considering subsequent episodes, this established both the effectiveness of the picket line and the practical ineffectiveness of the picket sign which bore this legend.
 
 
 4
 "No Dispute With Any Other Employer
 
 
 5
 Employees of Superior Derrick Corp., on Strike for Better Wages, Hours & Conditions, Seafarers Int., Union, AFL-CIO."
 
 Gretna Street Wharf — Railroad Picketing
 
 6
 We need not at this point discuss these facts as the Board[4] merely held as a matter of law that picketing of railroad employees at Gretna Street Wharf was not within the protection of 8(b) (4) (A) and (B). In so doing the Board was, of course, conscious of our prior decisions to the contrary.[5]
 
 
 7
 As it has in the past, the Board urgently renews the request that we reconsider and then overrule these decisions. In any case it felt, with deference, that administrative considerations compelled it to assert its contrary views until the Supreme Court could and would declare a uniform rule applicable in all circuits. The hopes in that direction must have considerably dimmed. For subsequent to the submission of this case, the 9th Circuit has rejected the Board's plea that it create a certiorari-provoking conflict by declining to follow our decisions, note 5, supra. Great Northern Ry. Co. v. N. L. R. B., 9 Cir., 1959, 272 F.2d 741. And at this late date, there seems little likelihood that this important question will ever reach the Supreme Court. For as the 9th Circuit points out, see notes 11 and 1, 272 F.2d 746 and 742, all doubt now has been completely removed by the 1959 Amendments. 73 Stat. 519, 1959 U.S.Cong.Code & Admin.News, No. 14, page 2984.
 
 
 8
 We adhere to our prior position and consequently the Board order may not stand. Neither the Board nor its Examiner determined, even conditionally, whether the action constituted illegal picketing. We cannot refrain from stating that it is unfortunate that the conditional findings, as in the 9th Circuit case, were not made. The very uncertainties which the Board emphasizes as a justification, if not a necessity, for its continuing to adhere to its contrary views notwithstanding the likelihood that the case would come before the 5th Circuit where it would be reversed, argues convincingly that as far as reasonably practicable the administrative fact and legal-inference-finding process should be completed. To talk in 1960 of an injunction against an event occurring in 1957 which will never be quite repeated demonstrates, we think, the need for procedures which will obviate further delay and, as here, the further consideration of a factual setting now grown stale by time and robbed of its legal uniqueness by an intervening act of Congress.
 
 
 9
 Since the law is, at least in this Court, now so clear and unions and their counsel are so well aware of it, we think this record is compelling that the Board could not have made any finding other than illegality so that it requires that we direct the issuance of an order forbidding picketing of this kind. For the reasons we elaborate in discussing the Dumaine Street Wharf incident, the SIU failed to make it clear that it was not an object of SIU to cause concerted action by the railroad crews to cease handling goods worked on by Superior with the view of thereby subjecting Superior to illegal pressures. When the engine crew coming in to take out loaded cars first encountered the picket line, inquiry was made by them of the pickets. The SIU leader's response was a repeated assertion that the picketing was legal. To a similar inquiry made by the railroad crewmen, another picket merely "informed them to read our signs and further told them that the signs were self-explanatory." Likewise, the pickets were noncommittal in either asking the railroad crew to cross, or not to cross, the picket line. After this initial and successful stoppage the circumstances of which would compel a Board finding of illegality — and which demonstrated again the effectiveness of the picket line and the ineffectiveness of the equivocal disclaimers of illegal objective — it is of no real consequence that, either in a later incident after the pickets had had to withdraw from the railroad property onto a public street a quarter of a mile away, or earlier the pickets may have used the words that it was "directed" against Superior only and not the railroad.
 
 Dumaine Street Wharf Picketing
 
 10
 The Board held that picketing which occurred at Dumaine Street Wharf subsequent to the Gretna and Charbonnet Street Wharf episodes was illegal. We agree.
 
 
 11
 One of Superior's derrick barges was moved to the Dumaine Street Wharf for use by Superior in performance of its contract with Texla Stevedoring, Inc., an entirely independent concern, to remove steel plates from a barge and load them onto a ship. The ship was alongside the dock with the derrick barge moored between the offshore side of the ship and the cargo barge. The ship's gangway was the only means by which longshoremen could board the vessel and by which employees of Superior could go from shore onto the derrick barge.
 
 
 12
 Approximately 75 longshoremen, members of the same ILA Locals 1418 and 1419, were working aboard the ship without incident during the morning. While the longshoremen were knocked off for lunch, the SIU agent took his station near the foot of the gangway carrying the picket sign which thus far had invariably stopped work by secondary employees. Again it worked. For the longshoremen would not reboard the ship to resume work after lunch so long as the gangway was picketed.
 
 
 13
 What occurred in the interim, the Board considered to be crucial. Some time after the picket was posted but before expiration of the lunch hour, the Board found "some of the longshoremen asked [the picket] what the picketing was all about. [The picket] admittedly did not reply to their questions." In the light of the earlier Charbonnet Street incident, the Board concluded that the picket, a responsible Union officer and apparently the leader in the organization campaign, could reasonably have anticipated that the "longshoremen would not cross the picket line, regardless of the legend on the picket sign." This, the Board reasoned, imposed on the SIU the duty to answer the question "so as to make it clear that the picketing was not directed against them" and to thus "minimize any possible interference with the work of the neutral employer, Texla."
 
 
 14
 The SIU apparently thinks that all that need be done to avoid the impact of § 8(b) (4) (A) and (B) is to compose a suitable sign and thereafter maintain a discreet silence or at least a noncommittal attitude if words are spoken. But the subsequent cases from this Court reveal that its reliance on N. L. R. B. v. General Drivers, Local 968 (Otis Massey case), 5 Cir., 1955, 225 F.2d 205, for such a view is plainly misplaced. In N. L. R. B. v. Truck Drivers, Local 728 (National Trucking Co.), 5 Cir., 1956, 228 F.2d 791, the picket sign purported to limit the dispute to the primary employer. Additionally, the union representative had stated that the picketing was "not to be intimated in any way against the [secondary employer] Ford." But when the secondary employer's representative asked the Union agent whether the purpose was not in fact to let the employees of the secondary employer (Ford) know of the dispute, the agent made no response but simply "smiled." 228 F.2d at page 793. We held that such "facts speak more eloquently than the spoken words, and [the Union agent's] significant silence * * * cannot be characterized as a clear disclosure." 228 F.2d at page 796. In N. L. R. B. v. Local 926 (Columbus Construction Co.), 5 Cir., 1959, 267 F. 2d 418, 419 at note 2, the signs were changed to make specific reference to "See our leaflet," but we held this undecisive. In N. L. R. B. v. Dallas General Drivers, Local 745 (Associated Grocery), 5 Cir., 1959, 264 F.2d 642, the picket signs were ostensibly directed to the public and urged the public not to buy goods distributed by the primary employer to the picketed retail stores. Nonetheless, we affirmed a Board injunction and recognized that the "normal purpose of a picket line is to persuade employees not to cross it." 264 F.2d 642, 648. The importance of these and similar cases of ours has been pointed out in Retail, Wholesale & Dept. Store Union v. Rains, 5 Cir., 1959, 266 F.2d 503, 505-506; Local 450, International Union etc. v. Elliott, 5 Cir., 1958, 256 F. 2d 630, in which the possibility of a difference in the approach of this Court and some other circuits was recognized.
 
 
 15
 Similar results have been reached in other circuits. In Truck Drivers & Helpers, Local 728 etc. v. N. L. R. B. (Campbell Coal), 1959, 101 U.S.App.D.C. 420, 249 F.2d 512, certiorari denied 355 U.S. 958, 78 S.Ct. 543, 2 L.Ed.2d 533, the signs referred expressly to the dispute with the primary employer only, but illegal picketing was declared from the failure of the picketing union to assure secondary employees when they walked off the job that the picket line was not directed at them. General Truck Drivers, Local 270 etc. (Diaz Drayage) v. N. L. R. B., 1959, 102 U.S.App.D.C. 238, 252 F.2d 619, certiorari denied 356 U.S. 931, 78 S.Ct. 775, 2 L.Ed.2d 762, affirmed a finding of illegal picketing because signs alone are insufficient since the secondary employees and their bargaining union would, without more, consider the picket line aimed at them as well. N. L. R. B. v. Laundry, Linen Supply & Dry Cleaning Drivers, Local 928 (Southern Service), 9 Cir., 1959, 262 F.2d 617, affirmed a Board injunction where by standing instructions, the pickets declined to elaborate on the signs or answer inquiries from members of the public or other tradesmen.
 
 
 16
 Of course this offers no automatic guide for union picketing at a common situs. By its nature, however, the purpose or intent of the picketing is not something which may be evaluated mechanically. And this is so whether it be by a sign, or a sign legend directing attention to a pamphlet, or a desire to obviate the uncertainties inherent in a recollection of what was orally said in response to oral inquiry. See, e. g., N. L. R. B. v. Ferguson, 5 Cir., 1959, 257 F.2d 88. Congress has forbidden the use of a picket against a secondary employer to induce or encourage secondary employees to strike or refuse to perform services where an object is to force or require that the secondary employer cease doing business with the primary employer. That is a declaration of a positive policy[6] which history records reflected great public dissatisfaction with the hapless predicament of the secondary employer caught in the middle. If any object of the picketing is to subject the secondary employer to forbidden pressure then the picketing is illegal. N. L. R. B. v. Truck Drivers & Helpers, Local 728 (National Trucking Co.), 5 Cir., 1956, 228 F.2d 791, 795; N. L. R. B. v. Dallas General Drivers, Local 745 (Associated Grocery), 5 Cir., 1959, 264 F.2d 642, 647-648. It need not be the sole or even main purpose.
 
 
 17
 It is not, as some courts sometimes seem to have intimated, a question of whether the effect is direct or incidental. Congress did not declare its prohibition in terms of effect. It legislated in terms of motive and purpose on the part of the active primary union setting up the picket line. Because of this, we find ourselves unable to accept the rationale of Seafarers' International Union etc. v. N. L. R. B. (Salt Dome Production), 1959, 105 U.S.App.D.C. 211, 265 F.2d 585, so strongly urged here by the same SIU. There that court equated the problem with the pressures to which the secondary employer would be subjected had the picketing taken place at the principal site of the primary employer's business rather than at the common situs presented in a Moore Drydock[7] situation. If the effect would be no greater or different in its influence on secondary employers contemplating doing business with the primary employer at his regular business site, the picket line would not, the court reasoned, violate § 8(b) (4) (A) and (B). But this is to disregard the plain language and purpose of 8(b) (4) (A) and (B). And, for that matter, this makes superfluous the oft cited element of the Moore Drydock formula that the union make clear that its controversy is with the primary employer only. For if illegality is to be measured by the comparable effect which the picket line would have, a primary union might have — and could even express it in categorical terms — a purpose and intent to cause the secondary employer to cease doing business with the primary employer and yet that conduct would still be legal. The problems of a common situs or the efforts of the Board and courts to accommodate the prohibition of the Act to them cannot permit such an outright disregard of Congressional language.
 
 
 18
 A picket line is a potent instrument. It may, of course, be the means of obtaining wide publicity for the grievances, actual or supposed, of a union either representing or seeking to represent workers. Members of the public and employees of other employers are a legitimate object of that publicity. But in the context of the long and sometimes bitter history of the trades union movement, it has a special message of its own. To a loyal unionist it is both a spontaneous plea not to engage in any business activity with those behind the picket curtain and an instantaneous branding of "unfairness" on those engaged in activity behind the picket line.
 
 
 19
 The primary union may hope that from the publicity other unionists may reach the decision that they as individuals do not wish to work under such circumstances. To this extent the Act affords no insulation against the pressures which might be generated on the primary employer. But if there is an expectation or a hope or a desire that employees of the secondary employer will be induced or encouraged to take concerted action so that the secondary employer will cease doing business with the primary employer, then the Act bars that activity. Cf. N. L. R. B. v. International Rice Milling Co., 1951, 341 U. S. 665, 71 S.Ct. 961, 95 L.Ed. 1277. It is not, as the Moore Drydock doctrine phrased it, merely a question of negativing the existence of a dispute with the secondary employer. The activity, including the picket line, must be conducted in such a way that the normal appeal of a picket line is overcome. It must be done so that all secondary employees will know that the primary union does not seek what the law forbids — pressure on the primary employer through pressure from the secondary employer because of concerted pressure of secondary employees on that secondary employer. N. L. R. B. v. Laundry, etc. Drivers, Local 928, 9 Cir., 1958, 262 F.2d 617, and Retail Fruit & Vegetable Clerks' Union etc. v. N. L. R. B., 9 Cir., 1957, 249 F.2d 591, 599. The law forbids such pressure whether the means be crude or sophisticated. The prohibition is continuous from the outset to the end. Local 74 etc. [Carpenters] v. N. L. R. B., 1951, 341 U.S. 707, 714, 1316, 71 S. Ct. 966, 970, 95 L.Ed. 1309. Neither signs nor papers nor pamphlets nor silence automatically insulate the activity.
 
 
 20
 The Board's order for the injunction has ample basis and is to be enforced. The Board's order denying the injunction as to the railroad picketing is reversed and the matter remanded to the Board for further consistent proceedings and with directions to enter an appropriate injunction.
 
 
 21
 Enforced in part and reversed and remanded in part.
 
 
 
 Notes:
 
 
 [1]
 The Union is the Seafarers' International Union of North America, Atlantic and Gulf District, Harbor and Inland Waterways Division, AFL-CIO
 
 
 [2]
 The Board proceedings under § 10(c), 29 U.S.C.A. § 160(c), are reported 122 NL RB 6. Pending final decision in the Board proceedings, the activity involved here was enjoined by the District Court in New Orleans under § 10(l). LeBus v. Seafarers' International Union, D.C. E.D.La.1958, 157 F.Supp. 510.
 
 
 [3]
 The briefs indicate that § 8(a) (1), (2) and (3) unfair labor practice charges have been heard by a Trial Examiner and are pending before the Board
 
 
 [4]
 Two members so voted; a third considered that both on the law and the facts the picketing was illegal and should have been enjoined
 
 
 [5]
 W. T. Smith Lumber Co. v. N. L. R. B., 5 Cir., 1957, 246 F.2d 129; International Rice Milling Co. v. N. L. R. B., 5 Cir., 1949, 183 F.2d 21, reversed in part on other grounds, 341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1277, on remand, 95 N.L.R.B. 1420 (1951)
 
 
 [6]
 N. L. R. B. v. Denver Bldg. & Constr. T. Council, 1951, 341 U.S. 675, 686, 71 S.Ct. 943, 950, 95 L.Ed. 1284, 1294; International Brotherhood of Electrical Workers v. N. L. R. B., 1951, 341 U.S. 694, 705, 71 S.Ct. 954, 960, 95 L.Ed. 1299, 1308
 
 
 [7]
 92 N.L.R.B. 547