**VULCAN MATERIALS COMPANY,**
Plaintiff-Appellee,

v.

**UNITED STEELWORKERS OF AMER-
ICA, AFL–CIO, and United Steelwork-
ers of America, Local Union No. 2176,
Defendants-Appellants.**

No. 28359.

United States Court of Appeals,
Fifth Circuit.

July 22, 1970.

Rehearing Denied and Rehearing En
Banc Denied Sept. 18, 1970.

Benj. L. Erdreich, Jerome A. Cooper, Cooper, Mictch & Crawford, Birming-

ham, Ala., Michael H. Gottesman, Bredhoff, Gottesman & Cohen, Washington, D. C., Bernard Kleiman, Gen. Counsel, Pittsburgh, Pa., for defendants-appellants.

John J. Coleman, Jr., A. H. Gaede, Jr., Birmingham Ala., for plaintiff-appellee; James William Lewis, Bradley, Arant, Rose & White, Birmingham, Ala., of counsel.

Before DYER, SIMPSON and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

This is an appeal from a judgment of the Northern District of Alabama for damages in the amount of $24,621.36 against the United Steelworkers of America, AFL–CIO (hereafter, the International) and its Local Union 2176 (hereafter, the Local, and referred to collectively as the Unions) in favor of the Vulcan Materials Company (hereafter, Vulcan), pursuant to Section 303 of the Labor Management Relations Act of 1947, as amended (hereafter, the Act), 29 U.S.C. § 187, as amended (1965).[1] We affirm.

---

1. 29 U.S.C. § 187 provides:

(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b) (4) of this title [§ 8(b) (4) of the Act].

(b) Whoever shall be injured in his business or property by reason or [sic] any violation of subsection (a) of this section may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title [§ 301 of the Act] without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit.

29 U.S.C. § 158(b) (4) provides in relevant part that:

It shall be an unfair labor practice for a labor organization or its agents * * * (4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal

in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

* * * * *

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title [§ 9 of the Act]: *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

* * * * *

Prior to December 29, 1967 Vulcan owned and operated a ready-mix concrete plant at Gadsden, Alabama, on premises immediately adjacent to premises on which it owned and operated a slag plant, which utilized raw materials received from a large blast furnace operation of the Republic Steel Corporation located nearby. On December 29, 1967 Vulcan sold all of its Concrete Products Division facilities in Alabama, Georgia, Florida, Maryland, North Carolina and Tennessee to Forman Ready-Mix Company, division of Kyle, Inc. (hereafter, Forman).

In the years preceding the disposition of Vulcan's Concrete Products Division, the production and maintenance employees of Vulcan's entire Gadsden facility, both the concrete plant and the slag plant, had been represented by the Unions and the same collective bargaining agreement covered both sets of employees. The contract expired by its terms on December 31, 1967. Negotiations were entered into between Vulcan and representatives of the Unions in early November, 1967. In the latter part of November, Vulcan made an oral commitment to sell its Concrete Products Division facilities to Forman, and its negotiators informed the Unions of the prospective sale on or about December 1, 1967. The Unions demanded that future negotiations with Vulcan regarding the slag plant employees be held jointly with its negotiations with Forman regarding the concrete plant employees. Vulcan rejected this demand and the negotiations between it and the Unions culminated on December 31, 1967 in a three-year collective bargaining agreement.

Sometime subsequent to December 1, 1967, the Unions entered into negotiations with Forman and when the collective bargaining agreement covering the concrete plant employees expired on December 31st without a new agreement having been reached, it was agreed that the Unions would continue to negotiate with Forman under a temporary arrangement whereby Forman agreed to adopt the terms and conditions of employment identical to those in the expiring contract until a new contract could be agreed upon. This arrangement was terminated by a strike that commenced at midnight, February 13, 1968, pursuant to a strike vote taken earlier among the Forman production and maintenance employees.

The strike was ostensibly against Forman and in support of the Union's demands previously made during the collective bargaining negotiations with Forman. However, the Unions' picket line was placed on an access road leading to both Forman's and Vulcan's plants, even though separate gates along the common access road had been designated for the employees of each to enter their respective places of employment, the two Vulcan employees were placed in charge of the picket line by the Unions. As a result of this and other conduct detailed below, the strike was totally effective against *both* Forman and Vulcan and remained so until the Unions reached an agreement with Forman and the strike ended on March 15, 1968. During this period, no Vulcan employee crossed the picket line to come to work, save for supervisory personnel, and, consequently, Vulcan's slag operation at the Gadsden plant was virtually shut down.

The district court found, *inter alia*, that neither Forman nor Vulcan was a predominant customer of the other's products; that they were engaged in different businesses, which produce different products; and that there was no interweaving or integration of economic fortunes of Vulcan and Forman, no overlapping of management functions and no actual common control of one by the other, or common ownership, and, therefore, that Vulcan was a neutral secondary employer. Further, the court found that the strike was conducted by both the Local and the International as a joint venture in violation of Section 8(b) (4) (ii) (B) of the Act, proximately causing damages to Vulcan in the amount of $24,621.-36.

## I. *Neutrality.*

The central question in this appeal is whether the district court was clearly er-

roneous in finding that Vulcan was a neutral secondary employer, that is, "any other employer" as that term is used in Section 8(b) (4) (i) and (ii) (B), so as to be entitled to the protection afforded by the Act.

It has been held that in order for an employer who is subject to a secondary boycott to avail himself of the protection afforded by the statute, it must be neutral and not affiliated or allied with the primary employer and that the neutrality of the secondary employer is destroyed and it is deemed to be an ally of the primary employer for the purposes of Section 8(b) (4) where there is actual common control exemplified by domination of the secondary employer by the primary employer, where there is an overlapping of management function, or where the economic fortunes of the two companies are inextricably interwoven, as, for example, where the secondary employer does substantially all his business with the primary employer or where there is a substantial integration of the two employers of the operational level. Sheet Metal Wkrs. Int. Ass'n., Loc. 223 v. Atlas Sheet Metal Co., 5 Cir., 1967, 384 F.2d 101; Truck Drivers & H. Local U. No. 728 v. Empire State Express, 5 Cir., 1961, 293 F.2d 414, cert. den. 368 U.S. 931, 82 S.Ct. 365, 7 L.Ed.2d 194. In the final analysis, however, the question of neutrality cannot be answered by the application of a set of verbal formulae. Rather, the issue can be resolved only by considering on a case-by-case basis the factual relationship which the secondary employer bears to the primary employer up against the intent of the Congress as expressed in the Act to protect employers who are "wholly unconcerned" and not involved in the labor dispute between the primary employer and the union.

Prior to December 29, 1967, Vulcan owned and operated both the slag plant and the concrete plant and the employees involved in the two operations were represented by the Unions in the same bargaining unit. On December 29, 1967, Vulcan sold the slag operation to Forman, and as the district court noted, and resulting transfer of employees and operations from the one company to the other inevitably led to a certain overlap of functions on various levels and other complications making the determination of Vulcan's status difficult.

Vulcan received nearly 60 percent of the purchase price of $10.8 million for its Concrete Products Division in cash and took a collateral installment note and a security interest in the transferred plants and equipment to cover the difference. The collateral installment note contains a provision requiring Vulcan's written consent before Forman can make certain changes in its business operation, alter its structure, make loans, pay dividends, increase certain salaries, etc.[2] On the basis of this provision, the Unions contend that Vulcan retained sufficient legal control over Forman to destroy its neutrality and that the district court's finding that "[t]here was no actual common control of one by the other, or common ownership" is clearly erroneous.

As was pointed out in *Atlas*, supra, 384 F.2d at 107, it takes *actual*

---

2. The provision reads:

Until all indebtedness evidenced hereby is paid in full; Maker [Forman] will not, without the written consent of Holder [Vulcan]: (a) Voluntarily change its form of business organization, the nature of its business or the existing management of its business; (b) merge or consolidate with any other corporation; (c) purchase, redeem or retire any of its own securities or purchase or otherwise acquire the securities of any other corporation; (d) make any loans or advances to or guarantee in favor of any other person, firm or corporation, except the extension of credit in the ordinary course of business, nor issue any securities which are not subordinate to this note; (e) encumber or mortgage any of its property, except for purchase money security interests; (f) change, alter or amend any real estate lease agreement to which it is a party; (g) declare or pay any dividends whatever or increase the salary [of two named Forman officials above a certain figure]; (h) dispose of any of its assets or make any purchases, sales or leases other than in the ordinary course of its business.

common control, not merely *potential* common control, to destroy neutrality. Furthermore, it has been held in a somewhat similar case that the retention of certain controls over a lessee's business by a lessor does not preclude the lessees from being neutral secondary employers where the lessor is engaged in a labor dispute. Retail Fruit & Veg. Clerks U. v. National Labor Rel. Bd., 9 Cir., 1957, 249 F.2d 591, 594–95. The provision here in question is commonplace in transactions of this kind to protect the interests of a lendor and there is no evidence that Vulcan has ever been called upon to actually exercise the potential control so provided. The district court's finding of no actual control is not clearly erroneous.

The Unions further contend that Vulcan and Forman were so interrelated, operationally and economically, to preclude Vulcan from asserting neutrality. In doing so, the Unions point to many factors, including the fact that the physical layout of the slag plant and the concrete plant demonstrate a physical interrelation of operations; that before the sale of the concrete plant the employees involved in the two operations constituted a single bargaining unit covered by a single collective bargaining agreement; and that the two operations were carried on after the sale in essentially the same manner, utilizing the same employees, equipment, and material as before the sale. For instance, there was no sign identifying the concrete plant as belonging to Forman, while the sign identifying the entire operation as belonging to Vulcan remained, just as before the sale. Likewise, Forman's concrete delivery trucks still bore the Vulcan name and trade symbol as well as the traditional colors utilized by Vulcan on its vehicles, just as before the sale. After the sale, Vulcan and Forman employees continued to enter the same gate, although another gate had been designated for the use of Forman employees, utilized the same time clock, intermingled their time cards in a common rack, and used the same bathhouse and locker room facilities. The employees of both companies contin-

ued to receive pay from the same place and from the same individual, although the employees received checks drawn on the account of their respective employer.

The Unions made a great deal out of the interchange of certain employees and services pursuant to a working agreement between Vulcan and Forman, whereby Vulcan agreed to provide Forman maintenance personnel, a front-end loader and operator, the switching of railroad cars and crane usage at fixed hourly or monthly rates for certain specified purposes. The two companies agreed to share the services of four clerical employees, pending a further evaluation of the work load, and the services of a janitor. Forman was to be billed for a percentage of a Vulcan employee's salary who rendered inspection services to Forman; and the cost of water, electricity, telephones, diesel fuel and gasoline was prorated between Vulcan and Forman until other arrangements could be worked out.

Likewise, the former Vulcan ready-mix concrete salesman continued in the same capacity for Forman and continued to take orders for both companies until the strike, and the former dispatcher for Vulcan continued in the same capacity for Forman and also continued to perform certain functions for Vulcan, principally in managing the operation on the Vulcan front-end loader.

The Unions also assert that the entire employee complement of Vulcan and Forman was treated as a single seniority unit down to and after the strike. This is not entirely correct. On December 27, 1967, Vulcan agreed with the Unions that long-term employees of the concrete facility who wanted to remain with Vulcan could exercise their accrued seniority under the expiring labor agreement to obtain positions at the Vulcan slag plant. Forman, after separate negotiations with the Unions, agreed to credit its employees with their full seniority previously accrued with Vulcan.

As can be seen, the factors relied on by the Unions to establish economic

and operational integration are largely incidental to the necessary transition from the complete economic and operational integration of the slag and concrete facilities prior to the sale of the concrete facility to Forman and the disintegration which would be consistent with separate ownership and operation of the two facilities. The fact remains that the basic operations and processes performed in the making of slag and performed in the making of concrete are carried out in different plants; that a different product is produced by each and that sales are made to essentially different customers; that Vulcan operates the slag plant for its own account and Forman operates the concrete processing plant for its own account; neither is a major customer of the other's products; and the capital and the management of the companies are entirely separate and independent. Moreover, each carried on its own labor relations independent of the other subsequent to the sale.

■■■ In determining whether the relationship of a secondary employer and a primary employer is such as to destroy neutrality, the court must look to the *essence* of the relationship, and not to its incidental trappings. See Sheet Metal Wkrs. Int. Ass'n Loc. 223 v. Atlas Sheet Metal Co., supra; Truck Drivers & H. Local U. No. 728 v. Empire State Express, supra; Local No. 24, Inter. Bro. of Teamsters, etc. v. N. L. R. B., 1959, 105 U.S.App.D.C. 271, 266 F.2d 675; N. L. R. B. v. Dallas General Drivers, etc., Local No. 745, 5 Cir., 1959, 264 F.2d 642, cert. den. 361 U.S. 814, 80 S.Ct. 54, 4 L. Ed.2d 61; Retail Fruit & Veg. Clerks U. v. National Labor Rel. Bd., supra. Furthermore, there is authority that the fact that two companies share a common bookkeeper, use the same stationery at the main office; that one performs minor services for the other and bills the other; that both companies are listed in the telephone directory at the same address and with the same telephone number is insufficient to establish that both companies are operated as a single, integrated business enterprise so as to destroy neutrality. Drivers, Chauffeurs and Helpers Local No. 639, 158 NLRB 1281, (1966). With regard to the interchange of employees and services pursuant to the operating agreement between Vulcan and Forman, it has been held that normally one who hires an independent contractor to perform services, such as the services supplied Forman by Vulcan, will not be considered an employer with respect to the independent contractor's employees, even though the independent contractor and its employees are subject to some quantum of control by the party using their services. Drivers & Chauffeurs Local Union No. 816, etc. v. N. L. R. B., 2 Cir., 1961, 292 F.2d 329, cert. den. 368 U.S. 953, 82 S.Ct. 396, 7 L.Ed.2d 386 (1962).

■ The Unions stoutly maintain that the instant situation is controlled by *Empire Express*, supra, and that, under that decision, the district court's finding that Vulcan was a neutral secondary employer is error. The Unions, however, have mistaken certain incidental aspects of the primary-secondary employer relationship in *Empire*, such as a common telephone number, prior common ownership, interchange of personnel and services and inadequate identification of the secondary employer, etc., for the more essential aspects of the relationship in *Empire* which destroyed the secondary employer's neutrality. *Empire* represents a classic example of a "straight line operation."[3] In *Empire*, Service, the secondary employer, engaged in the cartage business in the City of Atlanta almost for the exclusive benefit of Empire Express, the trucking company. The situation presented by the instant case, where two essentially separate and independent pro-

---

3. The National Labor Relations Board coined this phrase in Irwin-Lyons-Lumber Co., 87 NLRB 54, 56 (1949), where it held that two companies were engaged in a "straight line operation" where "the Lumber Company cuts the logs, the Broom Company transports the logs down the river, and the Lumber Company saws the logs into lumber at the mill."

duction operations were split apart and one sold to Forman, the primary employer, is different, and cannot be characterized as a "straight line operation", as the phrase is used in reference to the situation in *Empire*. The finding of the district court that Vulcan is a neutral secondary employer is not clearly erroneous.

## II. *Liability.*

The next issue presented by this appeal is whether the district court's finding that the Unions conducted the strike in such a manner as to result in a violation of the secondary boycott provisions of Section 8(b) (4) of the Act and thus be liable for damages under Section 303 is clearly erroneous.

The strike was authorized by both the Local and the International after a vote of the Forman production and maintenance employees. Although none of the Vulcan employees participated in the strike vote, neither did any of them report for work from the commencement of the strike at midnight, February 13, 1968, until it ended on March 15, 1968.

The picket line instituted by the Unions on February 14th was placed on the access road leading to the entrance gates of both the Vulcan and Forman facilities, in such a way that Vulcan employees would have to cross the picket line to report for work. Although the Forman employees had continued to use the Vulcan gate after the transfer of the concrete plant to Forman and up until the strike, a second gate was in existence next to the original Vulcan gate and designated for the use of Forman employees. On February 14th, a Mr. Wyatt Brock, Vulcan's Southeast Division Manager of Administration, requested that the picket line be moved to the gate designated for the use of the Forman employees, but the Unions refused and continued to picket along the access road for the duration of the strike. On March 4, 1968, a new gate into the Vulcan slag plant was opened above the existing gate and outside the Unions' picket line, but

in full view of it. The gate was called to the attention of the Unions, but Vulcan employees refused to utilize the gate and continued to refuse to return to work.

Instead of using Forman employees, International Representative Ryan placed two Vulcan employees, Union Zone Committeeman McAdams and Local Committeeman Stracener,[4] in charge of the picket line. McAdams, who was on the line daily, was the highest paid Union employee at either Vulcan or Forman during the strike and he was looked to for leadership at the picket line by his fellow Union members. Although stating that he urged Vulcan employees to return to work, McAdams also testified that he told them that he himself would not cross the Forman picket line. Neither Local President Brewster nor International Representative Ryan repudiated these statements, and at no time did they or McAdams take affirmative action to require Vulcan employees to return to work.

International Representative Ryan received several indications that the Vulcan employees were planning to join the Forman employees on strike before February 13th, but took no action other than urging individual Vulcan employees not to strike. At a general meeting of the Local on February 15, 1968, President Brewster advised the membership of the strike and remarked that striking members would appreciate people stopping by the picket line for encouragement.

A special union meeting was called on February 21st in response to a telegram to Ryan advising him that unless the Vulcan employees returned to work, legal action in behalf of Vulcan would be forthcoming. At this meeting Ryan told the Vulcan employees that they "were not violating any laws"; Zone Committeeman McAdams, the official in charge of the picket line, thanked each of the members for the support given him during the strike and reaffirmed his intention not to cross the picket line and return to work at Vulcan until a settlement was

4. During the course of the strike, Stracener was transferred from Vulcan to Forman.

reached with Forman; and Committeeman Stracener (now a Forman employee) gave a general report on the strike. However, no affirmative action was taken at the meeting to compel the Vulcan employees to return to work.

A second special meeting was called on February 28th as a result of Vulcan filing of an unfair labor practice charge against the Unions. At this meeting, Ryan advised the Vulcan employees that if they "continued to refuse to cross the picket lines of Forman Concrete, then they should sign an affidavit stating they were acting on their own and were not doing so on the advice of the Local or International Union.[5] After discussion, the affidavit was signed by all the Vulcan employees and they continued to remain away from work.

On March 6th, Brock, Vulcan's Southeast Division Manager of Administration, visited the picket line and was told in the presence of a number of Vulcan and Forman employees, "that [Vulcan] employees had decided not to go to work until Forman had a contract". During the same discussion, a Forman employee told Brock, in the presence of the others, that "when Vulcan wants this strike settled, it would be settled", and those present including McAdams, nodded in agreement with the statement. On the same day Brock advised Ryan over the telephone of the possibility that Vulcan would bring in supervisory personnel to operate its slag plant. Ryan responded that to do so would cause Republic Steel, whose employees the Unions represented and who supplied raw materials to Vulcan, to go down, and very pointedly suggested that to do so might cause a reoccurrence of the Bowman situation.[6]

On the basis of these facts, the district court found that "[t]he strike was conducted by both the Local and the Inter-national as a joint venture, and in carrying on the strike in a manner that impinged upon the protected rights of Vulcan, they cannot escape liability for damages under 29 U.S.C.A. § 187 proximately resulting from a violation of the secondary boycott provisions of the Labor Management Relations Act. 29 U.S.C.A. § 158(b) (4) (i) (ii) (B). The Unions contend that this finding is clearly erroneous. We cannot agree.

The Unions are guilty of violating Section 8(b) (4) of the Act and hence liable under Section 303 if they or one of their agents "engage[d] in or * * * induce[d] or encourage[d] any individual employed by [Vulcan] to engage in, a strike or a refusal * * * to perform any services;" or "threaten[ed], coerce[d] or restrain[ed] [Vulcan]," with the object of "forcing or requiring [Vulcan] * * * to cease doing business with [Forman] * * *". See Section 8(b) (4) (i) (ii) (B) of the Act; 29 U.S.C. § 158(b) (4) (i) (ii) (B).

There can be no question but that the Unions engaged in a strike against Vulcan: at no time during the Unions' strike against Forman did a Vulcan employee report for work. It is well established that as long as a union is functioning as a union it must be held responsible for the mass action of its members. United States v. International Union, U.M.W. of A., D.C.D.C.1948, 77 F.Supp. 563, 566, aff'd. 85 U.S.App.D.C. 149, 177 F.2d 29, cert. den. 338 U.S. 871, 70 S.Ct. 140, 94 L.Ed. 535 (1949). *Accord* United Textile Workers v. Newberry Mills, Inc., W.D.S.C.1965, 238 F.Supp. 366, 373, aff'd. 4 Cir., 1963, 315 F.2d 217, cert. den. 375 U.S. 818, 84 S.Ct. 54, 11 L.Ed.2d 53; Portland Web Pressmen's Union v. Oregonian Pub. Co., D.Or.1960, 188 F.Supp. 859, 866, aff'd. 9 Cir., 286

---

5. The affidavit reads:
   We work at Vulcan Materials in Gadsden and belong to the same local as men at what is now called Forman Ready Mix. The Local and International told us that we are not on strike and have a contract and should return to work. As individuals we have decided to work.

6. The phrase "Bowman situation" refers to an earlier strike in the Gadsden area marked by serious violence, shootings, etc.

F.2d 4, cert. den. 366 U.S. 912, 81 S.Ct. 1086, 6 L.Ed.2d 237 (1961).

It is equally clear that the Unions, through their agents, induced and encouraged [7] the Vulcan employees to refuse to report to work. Instead of taking steps to "overcome the normal appeal of a picket line" as required by Superior Derrick Corp. v. N. L. R. B., 5 Cir., 1960, 273 F.2d 891, cert. den. 364 U.S. 816, 81 S.Ct. 47, 5 L.Ed.2d 47,[8] the Unions used the picket line to induce and encourage Vulcan employees to refuse to work by placing Vulcan employees in charge of the picket line and by permitting and encouraging other Vulcan employees to be present at the picket line assisting Forman employees. Moreover, Vulcan employees were told at least twice that the picket line was legal and recognized by the Unions, it being the Unions' expressed policy that such picket lines should be honored, and by McAdams, the Unions' agent in charge of the picket line and erstwhile Vulcan employee, that he would not work for Vulcan while the Union struck Forman. These statements clearly constituted inducement or encouragement not to work. See Local Union No. 789, Int'l. Hod Carriers', etc. (Ceco Corp.) 125 N.L.R.B. 571, 573 (1959); General Drivers, Salesmen, etc., Local No. 984 (The Humko Co., Inc.) 121 N.L.

R.B. 1414 (1958). The Unions also "induced and encouraged" the Vulcan employees to stay away from work in violation of Section 8(b) (4) by calling the special meeting for February 28th to present an affidavit [9] written in collective language for Vulcan employees to sign if they were going to remain off the job. Truck Drivers & Helpers Local Union No. 728 v. N. L. R. B., 5 Cir., 1964, 332 F.2d 693, 697, cert. den. 379 U.S. 913, 85 S.Ct. 261, 13 L.Ed.2d 185; Truck Drivers & Helpers L. U. No. 728, etc. v. N. L. R. B., supra, 265 F.2d at 443. Finally, the Unions induced and encouraged Vulcan employees to stay off the job by their failure to take positive action to diminish the observable secondary effects of their strike against Forman. Superior Derrick Corp. v. N. L. R. B., supra.

Likewise, agents of the Unions threatened and coerced Vulcan for the purpose of causing Vulcan to cease dealing with Forman in violation of Section 8(b) (4) by threatening to close down Republic Steel, Vulcan's sole supplier of slag for the Gadsden plant, whose employees the Unions also represented, and by threatening that there would be a reoccurrence of the Bowman situation,[10] if Vulcan brought in supervisory personnel to run the slag plant.

---

7. In International Brotherhood of Electrical Workers v. N.L.R.B., 341 U.S. 694, 701–702, 71 S.Ct. 954, 95 L.Ed. 1299 (1951), held that "the words 'induce and encourage' are broad enough to include in them every form of influence and persuasion." *Accord* Truck Drivers & Helpers L. U. No. 728, etc. v. N.L.R.B., 5 Cir., 1959, 265 F.2d 439.

8. In *Superior*, this court said: "* * * if there is an expectation or a hope or a desire that employees of the secondary employer will be induced or encouraged to take *concerted* action so that the secondary employer will cease doing business with the primary employer, then the Act bars that activity. * * * It is not, as the Moore Drydock doctrine phrased it, merely a question of negativing the existence of a *dispute* with the secondary employer. The activity, including the picket line,

must be conducted in such a way that the normal appeal of a picket line is overcome. It must be done so that all secondary employees will know that the primary union does not seek what the law forbids—pressure on the primary employer through pressure from the secondary employer because of concerted pressure of secondary employees on that secondary employer. * * * The law forbids such pressure whether the means be crude or sophisticated. The prohibition is continuous from the outset to the end. * * * Neither signs nor pamphlets nor silence automatically insulate the activity." 273 F.2d at 897.
*Accord* Brown Transport Corporation v. N.L.R.B., 5 Cir., 1964, 334 F.2d 30, 36.

9. See n. 5, supra.

10. See n. 4, supra.

The Unions contend that the evidence adduced at trial was insufficient to establish the responsibility of either the International or the Local for any conduct violative of the Act and thus that the district court's findings that the strike was conducted by the International and the Local as a joint venture and that the damages assessed against the Unions were proximately caused thereby is clearly erroneous. Again, we cannot agree.

First of all, the National Labor Relations Act specifically provides in Sections 2(13) and 301(e) that

In determining whether any person is acting as an agent for another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or ratified shall not be controlling.

In other words, the acts of a union agent committed within the scope of his general authority is binding upon the union regardless of whether it was specifically authorized or ratified. See also Int'l. Longshoremen's and Warehousemen's Union (Sunset Line & Twine Co.) 79 N.L.R.B. 1487, 1507–1508 (1948). As for the International's responsibility, International Representative Ryan was a direct participant in the Forman strike and the resulting secondary boycott of Vulcan, and, even though he may have advised Vulcan employees to return to work, he never took action which could reasonable have been expected to effectuate this end and thus can be said to have, at the very least, acquiesced in and condoned the illegal activity. See Local Union 984, Int. Bro. of Teamsters, etc. v. Humko Co., 6 Cir., 1961, 287 F.2d 231, 243, cert. den. 366 U.S. 962, 81 S.Ct. 1922, 6 L.Ed. 2d 1254. The same can be said of Mr. Brewster, the president of the Local, regarding the Local's responsibility. The Unions' attempt to avoid responsibility for Zone Committeeman McAdams' conduct on the ground that he was a minor official elected by Vulcan employees only (before Forman bought the concrete plant) instead of the entire Local membership. The fact remains, however, that he was chosen by representatives of both the International and the Local to be in charge of the picket line and his acts in that regard were that of their agent. See Truck Drivers & Helpers Local Union 728 v. N. L. R. B., supra, 332 F.2d 697. Morever, since the International and the Local were acting in concert, they are responsible for the conduct, not only of their own agents, but of each other's agents. See e. g. Local Union 984, Int. Bro. of Teamsters, etc. v. Humko Co., supra.

The district court's finding that the Unions were liable under Section 303 of the Act is not clearly erroneous.

### III. *Damages.*

The final issue of importance is whether the district court's determination of damages can be sustained under the clearly erroneous rule.

The measure of damages in a Section 303 suit has been clearly articulated by this court in Sheet Metal Wkrs. Int. Ass'n., Loc. 223 v. Atlas Sheet Metal Co., supra, 384 F.2d at 109:

Section 303 of the N.L.R.B., 29 U.S.C. § 187, permits any person injured in his business or property as a result of a section 8(b) (4) violation to bring suit to recover the damages he has sustained plus the costs of the suit. The statute is compensatory in nature * * * and damages may only be recovered for actual losses sustained as a result of the unlawful secondary activity. While the employer must prove that he has sustained some injury to his business or property, he need not detail the exact amount of damages suffered. It is sufficient if the evidence supports a just and reasonable approximation. (Citing Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931))

*Atlas* also specifically held that damages could include the costs of any reasonable legal action to bring about a resumption of work. *Id.* at 110.

The Unions' principal contention regarding damages is that Vulcan failed to mitigate its damages when it reasonably could have done so, and hence failed to prove that its losses were caused by the Unions' unlawful secondary activities, by neither attempting to operate the slag plant nor have truckers pick up the slag on hand for delivery to its customers through the use of supervisory personnel. A plaintiff in a Section 303 suit clearly has the duty to minimize damages if it is reasonably possible to do so. International L. & W. Union v. Hawaiian Pineapple Co., 9 Cir., 1955, 226 F.2d 875, 880, cert. den. 351 U.S. 963, 76 S.Ct. 1026, 100 L.Ed.2d 1483; International Longshoremen's, etc. v. Juneau Spruce Corp., 9 Cir., 1951, 189 F.2d 177, aff'd. 342 U.S. 237, 72 S.Ct. 235, 96 L.Ed. 275 (1952). However, it was not reasonably possible for Vulcan to minimize damages; Vulcan could not reasonably be required to curtail their other operations in order to supply the personnel necessary to operate the Gadsden slag plant, particularly in view of the threats of March 6th by the Unions to shut down Republic Steel if supervisory personnel were brought in to operate the plant and to refuse to allow trucks out of the plant. The Union cannot have it both ways; it cannot engage in unlawful secondary activity designed to shut down an industrial operation and then claim that the plant should have been operated during the strike to minimize damages. As to the specific items of damages, it cannot be said that the finding that they were caused by the secondary work stoppage or that they are just and reasonable approximations of the actual amount of damages sustained is clearly erroneous.

## IV. *Arbitration.*

In conclusion, mention must be made of the Unions' contention that the district court should have granted their motion to stay pending arbitration under a clause in their collective bargaining agreement with Vulcan providing that the parties should submit to arbitration "any local trouble aris[ing] in any plant." This matter is controlled by Old Dutch Farms, Inc. v. Milk Drivers & Dairy Emp. Union, 2 Cir., 1966, 359 F.2d 598, 603, cert. den. 385 U.S. 832, 87 S.Ct. 71, 17 L.Ed.2d 67, where it was held in a Section 303 suit where arbitration was sought under a broad arbitration clause that

> * * * absent a clear, explicit statement in the collective bargaining contract directing an arbitrator to hear and determine the validity of tort damage claims by one party against another, it must be assumed that the employer did not intend to forego his rights under Section 303 and that the parties did not intend to withdraw such disputes from judicial scrutiny.

The arbitration provision here in question contains no "clear, explicit * * * statement * * * directing an arbitrator to hear and determine the validity of tort damage claims." The motion to stay pending arbitration was properly denied.

The judgment of the district court in favor of Vulcan and against the Unions is hereby

Affirmed.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

### PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.